Sophia C. MILLER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17975.

United States Court of Appeals Eighth Circuit.

Jan. 5, 1966.

Henry G. Morris, St. Louis, Mo., made argument for appellant and filed printed brief.

Robert J. Koster, Asst. U. S. Atty., St. Louis, Mo., made argument for appellee and filed brief with Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

VOGEL, Chief Judge.

Sophia C. Miller, appellant, was charged in a two-count indictment with having violated 26 U.S.C.A. § 7201[1] in that she

---

1. Under 26 U.S.C.A. § 7201:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

allegedly attempted to evade a part of her and her husband's income tax for the years 1961 and 1962 by willfully and knowingly filing or causing to be filed false and fraudulent joint income tax returns.

Specifically, the indictment charged that, as to Count 1, appellant in her return stated taxable income of $6,833.47 for 1961 with a tax due of $1,421.65, whereas taxable income was in fact $25,-232.75 with a tax due thereon of $7,328.-37. Count 2 charged that appellant stated in her joint tax return for 1962 a taxable income of $8,721.99 on which there was a tax due of $1,864.71, whereas taxable income was in fact $25,841.99 upon which was owed a tax to the government of $7,589.05.

Upon a jury's verdict of guilty as to both counts of the indictment, the appellant was sentenced to confinement for 30 months on each count, the sentences to run concurrently, and fined a total of $12,000. She appeals from the judgment of conviction.

The appellant had originally been arrested for abortion, a state offense. The arrest took place at her home at High Ridge, Missouri, at about 10 p. m. on January 12, 1963. Lieutenant V. E. Maxey, of the Missouri Highway Patrol, and Brunson Hollingsworth, Prosecuting Attorney for Jefferson County, Missouri, had interviewed a certain patient in St. Louis County Hospital on January 11, 1963, who told them that she had been aborted on January 10, 1963, at a home in High Ridge, Missouri, by a woman represented to her as Sophia Miller. Upon being shown pictures of known abortionists in the St. Louis area, she identified a picture of one Vera Daniels as "resembling" the woman who aborted her. She gave Lieutenant Maxey and Mr. Hollingsworth a description of the alleged abortionist's premises and told them the phone number of the place. She advised them that the telephone was listed under the name of "Miller" and that the doormat had the name of "Miller" imprinted thereon.

Hollingsworth caused a state complaint to be prepared, alleging that the appellant, "Sophie Miller, alias Vera Daniels", had performed a criminal abortion on the above informant. The complaint was signed by Hollingsworth on January 12, 1963. Hollingsworth testified that since January 12, 1963, was a Saturday, he telephoned the Clerk of the Magistrate Court, one Douglas C. Fraser, at his home in Jefferson County to obtain an arrest warrant. According to Hollingsworth's testimony, Fraser came to his office to prepare the requested warrant on the evening of January 12th. Fraser had no independent recollection of the events of January 12th. Upon the filing of the complaint, Fraser, according to Hollingsworth, issued an order of arrest for appellant, alias Vera Daniels, at about 6 or 6:30 p. m. on January 12, 1963. Later that evening Hollingsworth met Jefferson County Sheriff A. R. McKee, Lieutenant Maxey, Captain Vasel of the St. Louis County Police, Mary Jane McMullen, who was Vasel's secretary, and a number of troopers. Hollingsworth had the arrest warrant in his possession at the time and gave it to either McKee or Lieutenant Maxey. The officers then went to appellant's home, where they were admitted by Frank Miller, appellant's husband, who was advised that they had a warrant for the arrest of the appellant. Sheriff McKee testified that he then read the warrant to the appellant in the dining room of her home, where she was standing at the time. After the warrant had been read the entire premises were searched. Among other things the officers found two diaries, Government's Exhibits 4 and 5, under a chair cushion in the dining room where appellant had been placed under arrest. The diaries contained the names and addresses of a large number of men and women listed under specific dates for the years in question, 1961 and 1962. Next to the names of many of these individuals a notation appeared of 200, 250, 300, etc., or 2, 2½, 3 or 3½, etc.

Following her arrest, the appellant was taken to the courthouse in Hillsboro, Missouri, and was questioned by Lieutenant Maxey. She admitted to him that the entries in the two diaries were names

and addresses of persons for or on whom she had performed abortions during the years 1961 and 1962. Appellant further admitted to Lieutenant Maxey that the figures next to the persons' names represented the amounts she had charged such individuals, 200 meaning $200, 2½ meaning $250, 3 meaning $300, etc. She also admitted that during 1961 and 1962 she had performed approximately 200 abortions, from which she realized income of between $40,000 and $50,000. In the diary for 1962 there were additional entries in the rear of the book in the nature of monthly totals entered along with the name of the person who had made payment and the date and month on which payment had been received.

An Internal Revenue Agent, John C. Caton, testified at trial that in the early part of 1963 he prepared a schedule, Government Exhibit 8, which, using the information contained in the diaries, reflected the appellant's actual income for 1961 and 1962 as compared to her reported income. In addition to relying on the diaries for the construction of the appellant's income for the two years in question, the government called some 37 witnesses, whose names were obtained from the diaries, and who testified they had paid appellant in amounts ranging from $200 to $400, always in cash, and that these payments were for "abortions" or "medical services" performed by the appellant during 1961 and 1962. The testimony of the witnesses supported the accuracy of the two diaries referred to.

After indictment by a federal grand jury and prior to trial, appellant filed a motion to suppress and exclude from evidence objects and papers, including the diaries, seized from appellant's home at the time of her state arrest. An initial hearing was held on such motion on December 4, 1964. Prior to the time any ruling was made thereon, appellant filed a supplemental motion to suppress requesting an additional hearing in support thereof. The second hearing was held on January 15, 1965, at which time additional evidence, primarily in the form of testimony by Fraser, Clerk of the

Jefferson County Magistrate Court, was presented in behalf of the appellant. The motions to suppress were overruled.

On appeal to this court, it is contended:

### I.

The trial court committed prejudicial error by denying appellant a fair and orderly hearing on her two motions to suppress and exclude as evidence certain records seized by police officers in a raid on appellant's home.

### II.

The court committed prejudicial error in overruling appellant's pretrial motions to suppress and exclude as evidence the two diary memoranda books—Government Trial Exhibits 4 and 5; and the admission in evidence at the trial of said exhibits, together with the testimony of a number of witnesses whose names and leads relating to them were obtained through the use of said Exhibits 4 and 5.

### III.

The court erred in permitting various witnesses to testify they paid sums of money to appellant which the government relied upon to prove additional income not reported in her tax returns; and to permit Agent Caton to testify as to appellant's adjusted income, and the admission in evidence of Government's Exhibit 8, his computation schedule.

### IV.

The court erred in overruling appellant's objections to witness Maxey testifying at the trial as to admissions made by appellant to him after she was taken to the courthouse at Hillsboro.

We will deal with these contentions individually below.

### I.

Appellant first directs attention to the fact that the trial judge, on occasion during the two hearings on the motions to suppress, cross-examined several of the

witnesses, interrupted witnesses during their testimony, and warned certain of the witnesses about perjury statutes. We have carefully reviewed the transcripts taken at the times of the two hearings and find no prejudicial error occurred.

■■ We note, first, that in hearings such as were had herein, that is, on motions to suppress, the trial judge alone is responsible for fact determinations and conclusions to be drawn therefrom. He therefore has a special interest in bringing out all of the truth, in thoroughly understanding the testimony of the witnesses and in seeing that no witness perjure himself or, through misunderstanding, give the appearance of having done so. The oft-quoted remark of Judge Learned Hand in United States v. Marzano, 2 Cir., 1945, 149 F.2d 923, 925, fits admirably into this situation:

> " * * * A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert. Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; Montrose Contracting Co. v. Westchester County, 2 Cir., 94 F.2d 580, 583."

Since, in the instant case, no jury was present and since the remarks of the trial judge and his questions were solely for his own benefit in determining the truth of a disputed pre-trial matter, we do not see where, in the absence of a showing that the trial judge was so prejudiced as to have a pre-conceived opinion on the outcome of the hearing, there could possibly have been any prejudice to the appellant through the statements and questions of the trial judge. The fact that the judge allowed a supplemental second hearing is itself strong evidence that he

had no pre-conceived notions on the motions to suppress and that he gave appellant every opportunity reasonably possible to show that the questioned evidence should be suppressed. There being no showing of prejudice, appellant's contention must fail. Woodring v. United States, 8 Cir., 1963, 311 F.2d 417, 420, certiorari denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414.

Appellant would have us rely on Peckham v. United States, 1953, 93 U.S.App. D.C. 136, 210 F.2d 693, where a divided court reversed a criminal conviction because " * * * the excessive injection of the trial judge into the examination of witnesses, his numerous comments to defense counsel, indicating at times hostility, though under provocation, demonstrated a bias and lack of impartiality which may well have influenced the jury; * * *." 210 F.2d at 702. Clearly the Peckham case is distinguishable from the instant case on two distinct grounds. First, the conduct of the trial judge in Peckham, as evidenced in that opinion and accompanying appendix, was obviously blatantly abusive of defendant and his case, which was in no wise the situation herein. Second, and perhaps more importantly, there was a jury involved in Peckham which was allegedly poisoned by the trial judge's conduct and remarks.[2] We reemphasize that the conduct herein complained of took place at preliminary hearings and not before a jury. Furthermore, the record, read as a whole, abundantly supports the conclusion that the trial judge was concerned only with getting at the truth so as to effectively rule on the motion to suppress.

In the hearings on the motion to suppress, the crucial questions were whether the arrest warrant for appellant had been issued before the search and seizure on January 12, 1963, or whether the search and seizure had taken place before the

2. As noted by Judge Matthes for this court in Franano v. United States, 8 Cir., 1962, 310 F.2d 533, 537, certiorari denied, 373 U.S. 940, 83 S.Ct. 1545, 10 L.Ed.2d 694:

"* * * However, since a trial judge's influence upon a jury is necessarily of such great magnitude, a trial judge should exercise care and discretion in expressing an opinion so as not to mislead or, in effect, to destroy the jury's right as the sole arbiters of all fact questions."

warrant was issued. Appellant argued that the warrant was issued on January 14, 1963, and was predated to January 12, 1963. It had to be obvious from the very beginning of the initial December 4, 1964, hearing that the testimony would be conflicting on this matter. At the first hearing appellant, her husband, and appellant's employee, Herman Henry, who was also present at appellant's home on the night of the arrest, testified no warrant was read or shown to them on the night of January 12, 1963. Contrary testimony and evidence was provided by the arresting and searching officers, by prosecuting attorney Hollingsworth, and by the official records of the Magistrate Court of Jefferson County, Missouri. The January 15, 1965, supplemental hearing was requested by appellant who desired to present further testimony on a supplemental motion to suppress through Douglas C. Fraser, who, as already alluded to, was Clerk of the Jefferson County Magistrate Court at the time the warrant was issued. It became clear that by requesting the hearing appellant anticipated that Fraser would testify contrary to the official records of the Jefferson County Magistrate Court. This potential conflict was obviously also seen by the trial judge. This alone was a sufficient warning signal to the trial judge so that an admonition to Fraser with regard to perjury was not misplaced. In this light the following took place at the January 15th supplementary hearing as Fraser was preparing to testify:

"The Court: I just want to get this man clear with respect to the matter so that we understand one another, and, of course, being a public official, you know, I think I should say to you you are familiar with perjury statutes?

"The Witness: Yes, sir.

"The Court: And if you haven't asked a lawyer about it, I might suggest you might talk to one. I just [don't] want [you] to get into it with[out] knowing what you're doing, because *I've already indicated in this one that when we get through*

*that the court is going to ask the District Attorney to present the matter to the grand jury,* and I don't— I have no more to say except I want you to understand what the situation is.

"Let's proceed.

"Mr. Morris [appellant's counsel]: Let the record show that I filed a supplemental motion, which is in this file here, and based upon the information I got from Mr. Fraser, and I think, your Honor, that what has transpired now is very detrimental to the presentation of this motion and the evidence in connection with it.

"The Court: Let me say to you—

"Mr. Morris: And I want to make a record on that.

"The Court: All right, you make your record, but let me say this to you, Mr. Morris, so we understand one another, that you understand that the court from time to time gets information, and I have some information about the matter, and it may end up in a swearing match, and I don't think that I should permit any witness to take the stand when we are going to get into that without merely telling him what the situation is. *Now, I'm not trying to tell him what he should swear [to], I just want him to understand what it is.*

"Mr. Morris: Well, I think—

"The Court: Because you're not the only one that's investigated the case either, and we're not interested in this court in trying to convict anybody of anything when the charges are not legitimate." (Emphasis supplied.)

During oral argument before this court counsel for the government stated that he, himself, as well as appellant's supplemental motion to suppress, may very well have been the source of the judge's "information" that a potential conflict might arise between the Jefferson County Magistrate Court records and the tes-

timony of Fraser. In fact, the government was investigating this possible conflict with a view toward the taking of grand jury action if such conflict had ever actually occurred during the hearing. Although our system of law enforcement frowns on extra-judicial matters occurring outside of the courtroom entering into a judicial determination, here it is clear that appellant was not prejudiced by what the government counsel apparently casually mentioned to the judge. All that the judge was concerned about, as is clearly evidenced in the record, was that the truth came out. One way of insuring this was to remind this witness and others that they were under oath and what the consequences of violating such an oath would be. Which witnesses to warn was clearly within the discretion of the trial judge.

It should further be noted, in closing discussion on this point, that had appellant's counsel seriously desired to cross-examine the apparent ultimate source of the judge's "information" obtained from the government, one Jack Wallace, a revenue agent who was sent to interview Fraser by the government counsel when it appeared there might be a conflict arising because of Fraser's anticipated testimony, he could have done so. Mr. Wallace was in the courtroom during the January 15, 1965, hearing and, as clearly indicated in the record, appellant was aware of Wallace's function and presence. The record shows that the reason Wallace was not called as a government witness was because Fraser testified that he had no independent recollection of the events of January 12, 1963. Had Fraser testified contrary to the Magistrate Court records, Wallace would have no doubt been called to testify concerning his investigation of and talks with Fraser.

## II.

Appellant next contends that Exhibits 4 and 5, the diaries seized by police officers at the time they arrested appellant in the dining room of her home, should have been excluded from evidence.

Whether or not such items were improperly admitted hinges in part on whether or not there was, in fact, an arrest warrant properly procured and used on the night of January 12, 1963. As already indicated the government's testimony shows that the criminal complaint was signed by Hollingsworth on Saturday, January 12, 1963, that he contacted Fraser at his home, and that Fraser came to his office in the evening of January 12th to prepare and issue a warrant of arrest. Appellant countered that no warrant of arrest had been issued until Monday, January 14, 1963, and that such warrant had then been dated back to January 12th. On the warrant itself the sheriff's stamp indicates he received the warrant on January 14th. However, the figure "12" has been written in ink over the stamped "14." Appellant relies in part on the testimony of Fraser who, it will be recalled, stated that he had no independent recollection of the facts surrounding the issuance of this particular warrant and that he could not recall whether or not he signed the arrest warrant for appellant on January 12, 1963. He did testify that he could not recall hearing the name of Sophia Miller prior to January 14, 1963. It was the further contention of the appellant and her witnesses that no warrant of arrest was read to her in the dining room of her home, and that the search thereof was without warrant and thus unreasonable and in violation of her constitutional rights so that the fruits of such search should have been suppressed. Other substantial testimony, presented by government witnesses, that of Hollingsworth, Sheriff McKee, Captain Vasel, Lieutenant Maxey and several others, indicated quite clearly that the warrant was issued on January 12th, was in the possession of the sheriff at the time he made the arrest, and was read in pertinent part by McKee to the appellant. The Jefferson County Magistrate Court records clearly show that the warrant of arrest was signed by Fraser and issued on January 12th. Fraser admitted on cross-examination that he had gone to his office at night on numerous occasions to issue arrest warrants, but

that he could specifically recollect only one such occasion and that was because it involved a gambling raid "where there were many, many defendants".

■ Since there is substantial evidence to justify the trial judge in finding that there was, in fact, an arrest warrant in existence on the night of January 12, 1963, which was produced and read to appellant, there is no need for further discussion. Certainly there is no proof of clear error justifying a reversal of the trial judge in his findings of fact. He chose to believe the government's rather than appellant's witnesses. Credibility of witnesses on a motion by a defendant to exclude or suppress evidence was for the determination of the trial judge. See United States v. Vita, 2 Cir., 1961, 294 F.2d 524, 528, certiorari denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788, certiorari denied, 369 U.S. 866, 82 S.Ct. 1032, 8 L.Ed.2d 85 and cases cited therein.

A reasonable explanation, one that must have been believed by the trial judge, as to why Sheriff McKee's stamp indicated the warrant was received by him on January 14th is that, as McKee testified, he did not have his "received" stamp with him on the night of the 12th when he received the warrant. He did not recall stamping the warrant that night. The warrant was probably given to McKee on the night of the 12th for service, as he testified, and was served on that date as the warrant itself indicates. The first time McKee returned to his office, where the "received" stamp was located, with the warrant in his possession was the following Monday morning, January 14th. This was after the warrant had been executed. The "received" stamp had already been changed to read January 14th. Realizing that a mistake had been made, whoever placed the "received" stamp on the warrant on the 14th superimposed a "12" over the "14". Furthermore, if the warrant had not actually been issued until Monday, January 14, 1963, it certainly would not have carried the "alias Vera Daniels" for the officers then well knew they were

dealing with Sophia Miller since she, her husband and their employee had furnished bonds and been released the day before, January 13, 1963.

■ Appellant argues in the alternative that even if the warrant of arrest was in existence on January 12th it was invalid. The warrant was issued under Missouri Supreme Court Rule 21.08 of the Rules of Criminal Procedure V.A. M.R. which provides:

"* * * upon complaint made by the prosecuting attorney, it shall also be the duty of the clerk thereof to issue a warrant * * *. If such warrant is issued under the hand of the judge or magistrate, it need not be sealed but if it is issued under the hand of the clerk of the court, the seal of the court shall be attached thereto."

Claiming that Supreme Court Rule 21.08 affected substantive instead of procedural rights, appellant would hold the warrant issued herein as invalid since the Missouri Constitution, Article 5, § 5, V.A.M.S., provides that:

"Section 5. The supreme court may establish rules of practice and procedure for all courts. *The rules shall not change substantive rights,* or the law relating to evidence, the oral examination of witnesses, juries, the right of trial by jury, or the right of appeal. * * *" (Emphasis supplied.)

We do not agree. The method of issuing a warrant is purely a procedural requirement as contemplated by the Missouri Constitution. A warrant, as involved herein, issued by the clerk, in accordance with the provisions of Rule 21.08, is valid.

■ The issuance of the warrant herein and the subsequent search and seizure meet the probable cause test of the federal courts even though these matters were handled by state and local officers, as required by Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669. As we have noted, Lieutenant Maxey and Hollingsworth had re-

ceived information on January 11, 1963, that on the preceding day a person known as Sophia Miller had performed an illegal abortion. They were given Sophia Miller's address and telephone number. The victim of the abortion picked out pictures of a woman known to the police as Vera Daniels. From this information the complaint and warrant of arrest were made out as to "Sophie Miller, alias Vera Daniels". Abortion is a felony under the laws of the State of Missouri. § 559.100 Mo.Rev.Stat.1959. There can be little doubt that the probable cause for arrest, and thus for the accompanying search and seizure, met the standard as set forth in Ker v. State of California, 1963, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630–1631, 10 L.Ed.2d 726:

> "The evidence at issue, in order to be admissible, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' Brinegar v. United States, 338 U.S. 160, 175–176 [69 S.Ct. 1302, 93 L.Ed. 1879] (1949), quoting from Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 69 L.Ed. 543] (1925); accord, People v. Fischer, 49 Cal.2d 442, 317 P.2d 967 (1957); Bompensiero v. Superior Court, 44 Cal.2d 178, 281 P.2d 250 (1955). The information within the knowledge of the officers at the time they arrived at the Kers' apartment, as California's courts specifically found, clearly furnished grounds for a reasonable belief that petitioner George Ker had committed and was committing the offense of possession of marijuana."

Appellant here would also claim the protective mantle of Mapp v. Ohio, 1961,

367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. We find no comparability. In *Mapp* there was a completely lawless search and seizure. The state police entered a home forcefully and without color of warrant and seized documents later used in the state courts of Ohio to convict Miss Mapp. Here the evidence shows that the searchers went to the address given by the informant. Lieutenant Maxey and Miss McMullen went to the door. Both of them knocked. Appellant's husband answered. Miss McMullen asked if appellant was there and he replied yes, that she was. Lieutenant Maxey stated that he was a police officer and that he had a warrant for appellant's arrest. Lieutenant Maxey then motioned to the other officers and all of them entered the house. Maxey handed the warrant to Sheriff McKee, who read it to Mrs. Miller, who in turn was standing in the dining room.

Following her arrest, the search of Mrs. Miller's person and the premises over which she had control was entirely reasonable and proper. Haas v. United States, 8 Cir., 1965, 344 F.2d 56, 60. The diaries, the evidence which appellant sought to have suppressed, were found in the very room in which appellant was arrested. The search was for instrumentalities and drugs used in the commission of the crime of abortion, for which the complaint and warrant had been issued. The two diaries were used by appellant to maintain a record of her unlawful operations. They were, then, instrumentalities used in connection with the commission of the crime of abortion. The seizure of such books was entirely lawful as an incident of the arrest of the appellant. In Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, rehearing denied, 331 U.S. 867, 67 S.Ct. 1527, 91 L.Ed. 1871, the Supreme Court stated at page 151 of 331 U.S., at page 1101 of 67 S.Ct.:

> "The opinions of this Court have clearly recognized that the search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate

control. Thus in Agnello v. United States, supra, 269 U.S. 20 at page 30 [46 S.Ct. 4, 70 L.Ed. 145], it was said: 'The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted.' It is equally clear that a search incident to arrest, which is otherwise reasonable, is not automatically rendered invalid by the fact that a dwelling place, as contrasted to a business premises, is subjected to search."

And at page 153 of 331 U.S., at page 1102 of 67 S.Ct.:

"This is not a case in which law enforcement officials have invaded a private dwelling without authority and seized evidence of crime. Amos v. United States, 1921, 255 U.S. 313 [41 S.Ct. 266, 65 L.Ed. 654]; Byars v. United States, 1927, 273 U.S. 28 [47 S.Ct. 248, 71 L.Ed. 520]; Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 115 F.2d 690. Here the agents entered the apartment under the authority of lawful warrants of arrest. Neither was the entry tortious nor was the arrest which followed in any sense illegal."

### III.

■ Appellant's third contention, that the trial court committed error in permitting the testimony of some 37 witnesses whose names were obtained from the diaries, must fall since we have held, supra, that the arrest and the search and seizure which followed were entirely lawful. This being so there was no error in using, at trial, the information obtained from the diaries—the fruits of the search—nor in using witnesses whose names were obtained therefrom. It fol-

lows that these witnesses could corroborate the entries in the two diaries.

■ As noted heretofore, a government witness from the Internal Revenue Service, John C. Caton, computed appellant's income for the years in question. In making his computations, which are reflected in Government Exhibit 8, Caton relied in great part on the information in the diaries, the corroborating testimony of the witnesses whose names were contained in the diaries and on interpretations of the figures in the diaries related by appellant to Lieutenant Maxey following her arrest. The search and seizure being lawful and, as will be indicated, infra, the questioning of appellant and the use of information derived therefrom being permissible, there was no error in allowing the introduction of Government Exhibit 8 and in allowing Caton's accompanying testimony.

Appellant earnestly contends that the government is required to prove every figure in the diaries in order to use them in ascertaining her income. Clearly the testimony of the 37 witnesses and appellant's own admissions are enough to sustain an inference that all figures in the diaries represented income from abortion-related activities. This is not a situation of the government "having no or little direct evidence" of appellant's guilt as was the situation in Demetree v. United States, 5 Cir., 1953, 207 F.2d 892, 893, a case relied on by appellant.

■ It is appellant's further contention that she was denied her right to cross-examine the sources of the diary figures other than those testified to by the 37 witnesses. Appellant, who did not herself testify at trial, could have presented these prospective witnesses on her own behalf. She knew their identity and addresses better than anyone else. Cf., Fowler v. United States, 8 Cir., November 4, 1965, 352 F.2d 100, 112, at f. n. 4 and accompanying text. Certainly the government's uncontradicted proof clearly established the significance of the figures in the diaries. The jury was the ultimate determiner of fact as to whether or not there was unreported income.

There was substantial evidence in the record to support such a finding. United States v. Johnson, 1943, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546, rehearing denied, 320 U.S. 808, 64 S.Ct. 25, 88 L.Ed. 488.

## IV.

Appellant's fourth and final contention is that the court erred in overruling her objections to Lieutenant Maxey testifying at the trial as to admissions made by her to him after her arrest when she was taken to the courthouse at Hillsboro. This is premised on two points—(a) that the search and seizure and the arrest were illegal and (b) that there was no showing by the government that the appellant had been advised of her constitutional rights that she need not make a statement, that any such statement could be used against her, and that she was entitled to have counsel.[3] We have already disposed of point (a). In support of point (b) appellant cites the much-discussed case of Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

The only objection made before the trial court to Lieutenant Maxey's testimony regarding appellant's admissions was as follows:

"Mr. Morris: Your Honor, I object to any discussion he had with the lady, Mrs. Miller, on the grounds, as I have stated before, namely, that—I'm contending, namely, that the entry into the house was illegal and the search and seizure illegal. Therefore, any occasion he had to talk to Mrs. Miller incidental to that and following that, in my opinion, would be illegal and not binding upon Mrs. Miller, and they had no right to question her at all."

The objection, which was promptly overruled, was not made on the grounds raised in appellant's point (b)—i. e., that appellant had not been advised of her constitutional rights to counsel, that she was not told by the authorities that she need not make any statement, and that she was not informed that any statement she made could be used against her. Appellant's objection was solely based on her point (a)—i. e., the alleged illegal search and seizure. The record is silent as to whether or not appellant was apprised of her rights prior to making the damaging statements. This situation may not be equated with that in *Escobedo* where, as the court stated at page 483 of 378 U.S., at page 1761 of 84 S.Ct., "Petitioner moved both before and during trial to suppress the incriminating statement, but the motions were denied", it being clear from the record therein that the assistant state's attorney " * * * did not advise petitioner of his constitutional rights, and it is undisputed that no one during the course of the interrogation so advised him." We do not think appellant should now, for the first time, be permitted to challenge the statements on these grounds when it is now impossible for the government to show that she may, in fact, have been advised of such rights prior to the interview. This court stated in Robinson v. United States, 8 Cir., 1964, 327 F.2d 618, 623:

"The prosecution therefore was not challenged about the arrest, showed only such facts as led to the search, was under no necessity of offering evidence in justification and explanation of the entry, and in effect was lulled into an assumed security which the defense would now make false. We, of course, do not know from this record what the government would or could have proved by way of explanation and justification. We do feel that, under the circumstances of this case, the defense is not now in a position to complain by afterthought. If an arrest and the search and the discovery

---

3. No claim was made in the District Court or here that the statements of the appellant to Lieutenant Maxey were coerced or involuntary, such as might require a hearing for determination thereof as provided for in Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

of evidence are to be challenged on appeal, that challenge must be made in the first instance in the trial court. Fairness to that court and to counsel and to a reviewing court demands this. So do 'fair procedural requirements'. This presents no 'plain error' or Rule 52(b) situation for there may be no error at all. Somewhere the rights of the public and the rightful demands of orderly criminal procedure deserve protection, too."

See, also, Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed. 2d 1503; United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Cofer v. United States, 8 Cir., 1958, 256 F.2d 221, 222, 223, certiorari denied, 358 U.S. 840, 79 S.Ct. 65, 3 L.Ed.2d 75.

We do not deem it necessary to remand this case for a hearing on the *Escobedo* point since, even if we consider appellant's *Escobedo* objection on its merits,[4] we do not feel that she falls within the purview of that decision. In Escobedo the Supreme Court stated at pages 490–491 of 378 U.S., 84 S.Ct. at page 1765:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 [83 S.Ct. 792, 9 L.Ed.2d 799], and that no

statement elicited by the police during the interrogation may be used against him at a criminal trial."

The Supreme Court closed that opinion by stating at page 492 of 378 U.S., at page 1766 of 84 S.Ct.:

" * * * We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

Thus, at least under present law, *Escobedo,* which deals with the question of *when* the right to counsel attaches, appears to be limited to certain factual situations not analogously present in the instant case. Of course, there is obviously much disagreement in the application of *Escobedo,* itself a 5 to 4 decision, and perhaps there are nearly as many different interpretations as there are state and federal courts who have attempted to pass upon the question. Compare, e. g., Russo v. New Jersey, 3 Cir., May 20, 1965, 351 F.2d 429, with United States v. Robinson, 2 Cir., November 22, 1965, 354 F.2d 109. However, any extension of when the right to counsel attaches should not be automatically granted in the light of a strong policy to enforce an effective system of criminal justice. One's Sixth Amendment right to counsel cannot be taken lightly, but each decision must depend on the facts of the case therein involved.

This court, in Hayes v. United States, 8 Cir., 1965, 347 F.2d 668, 669–670, noted that the Supreme Court has not established an absolute rule that a confession made without counsel violates Sixth Amendment rights under all circumstances. Judge Blackmun, speaking for this court in Mitchell v. Stephens, 8 Cir., November 24, 1965, 353 F.2d 129, 141–142, again emphasizes the view that *Es-*

4. Cf. Harris v. United States, 8 Cir., 1961, 297 F.2d 491, 492; Page v. United States, 8 Cir., 1960, 282 F.2d 807, 810.

*cobedo* must, in some degree, be limited to its facts. He states:

"We therefore do not believe that the holding in Escobedo has a factual parallel or effective application here. If Mitchell's rape confession was the product of coercion and hence was inadmissible, this will be due to other factors and other aspects and not to fundamental unfairness because of the absence of counsel at the confession."

In the instant case, contrary to *Escobedo,* something less than a confession is involved, since appellant's admissions relating to the tax evasion charge cover only the interpretation of figures to be found in the diaries and are not, per se, the confession of a violation of the income tax laws. In fact, the income tax case against appellant certainly had not entered the accusatory stage at the time she was questioned by Lieutenant Maxey. Lieutenant Maxey and the other state officers were investigating the commitment of the state crime of abortion, and in all probability did not have in mind, when appellant made the admissions, a possible violation for the filing of false and fraudulent income taxes. As to Count 2 of the indictment, covering appellant's 1962 tax return, that crime could not even have been committed on January 13, 1963, when appellant was interviewed, since appellant's 1962 return was not filed until June 4, 1963. (An extension of time to file had been given to her because of the illness of her husband.) Certainly as to Count 2 there was not even a possibility that any "focus" had centered on appellant as a suspect for income tax evasion. We are unwilling, in the absence of cogent reasons to the contrary, to say that when the accused is the focus of one crime (here abortion), admissions as to another completely unrelated crime (here tax evasion), the commission of which is unknown to the investigating officers, will be inadmissible into evidence as falling within a blanket exclusionary rule of *Escobedo.* The *Escobedo* defendant had clearly become the accused in the murder charge for which he was eventually tried, and his admissions related to the murder charge. This is not the situation herein.

Furthermore, it was not shown that appellant "requested and had been denied an opportunity to consult with [her] lawyer" (491 of 378 U.S., 1765 of 84 S.Ct.) as was the case in *Escobedo.* Appellant was aware of and experienced with court precedures, having been convicted, in the early 1950's, of the crime of abortion in the state courts of Missouri. This also differs from *Escobedo* where the defendant therein was a "layman" (486 of 378 U.S., 1762 of 84 S.Ct.) in the law. The *Escobedo* defendant had retained counsel, such counsel was actually at the police station demanding to see his client, and the defendant was demanding to see his counsel. This certainly was not true in the instant case.

The Court of Appeals for the Second Circuit, sitting en banc in United States v. Cone, decided November 22, 1965, 354 F.2d 119, has very recently held, with one judge dissenting, that statements made by the appellant subsequent to his arrest on a narcotic violations charge were admissible and not within the scope of *Escobedo.* The statements were made on a street corner while Cone and the arresting officers waited for a government automobile to pick them up. Cone had not been warned that he had a right to remain silent; that any statements he made could be used against him, nor that he had a right to counsel. On the same day as it handed down *Cone* the Second Circuit decided United States v. Robinson, November 22, 1965, 354 F.2d 109. The court, again sitting en banc, held by the slimmer margin of five to three that the admissions of the appellant therein, George Robinson, made at a police station subsequent to his arrest on a narcotics charge, did not come within the purview of *Escobedo* so as to be inadmissible in court. Robinson also was not warned that he had a right to remain silent, that what he said might be used in evidence against him, or that he was entitled to consult counsel. *Robinson* goes a step further than *Cone* in that

Robinson's statements were made at the police station during "routine and casual questioning", whereas Cone's statements were made almost immediately after the arrest while still en route to a police station. It is clear, however, that in both *Cone* and *Robinson* the record indicates that neither appellant had been warned of his constitutional rights to have counsel and to remain silent. *Cone* and *Robinson* lend some support to the instant determination of the *Escobedo* question, especially when it is realized that in those two cases timely objections were raised at trial which was not true in the instant case.

For the above stated reasons, we would not extend the teachings of *Escobedo* to embrace the circumstances surrounding the questioning of appellant herein.

### V.

Having considered the entire record and the contentions of the appellant, and being convinced that Mrs. Miller was given a fair trial, this case is in all things affirmed.