473 P.2d 895

The STATE of Utah, Plaintiff
and Appellant,

v.

Harrison LARGO, Harry Tsosie, Clarence
Peter, Chavez Whitehorse, Reid Barber
and Mose Clark, Defendants and Respond-
ents.

No. 11832.

Supreme Court of Utah.

Aug. 20, 1970.

Vernon B. Romney, Atty. Gen., Lauren N. Beasley, Joseph P. McCarthy, Asst. Attys. Gen., Salt Lake City, for plaintiff and appellant.

L. G. Bingham, Ogden, for defendants and respondents.

HENRIOD, Justice:

Appeal by the State from an order in arrest of judgment after a jury verdict of guilty of assault with attempt to rape as to five of the defendants and simple assault as to the sixth. Reversed and remanded for a new trial.

The defendants, young men attending the Intermountain Indian School at Brigham City, Utah, confessed to the charges, but attack the jury verdicts on the ground their confessions were inadmissible under the principles enunciated in Escobedo v. Illinois[1] and Miranda v. Arizona.[2]

One evening, following a basketball game, the lights went out at the school, and during the blackout, defendants allegedly entered a girls' dormitory and committed the assault. Without detailing the voluminous record, it can be said that the counselors at the school investigated the incident, questioning dozens of students who, they believed, may have had knowledge thereof, and generally advising all of them to tell the truth. There appears to have been a genuine interest on the part of the school administrators to determine what happened and who may have participated on the occasion. There was no evidence as to any specific accusation directed specifically toward any one person, but during the course of the inquiry the defendants admitted participation in the event and signed a statement to that effect. At no time did the counselors advise them of their rights under the Miranda decision. There was no evidence of pressured coercion, inducement, undue influence or other circumstance indulged as an incentive to exact or force a false or any other kind of a confession from the students.

After this rather general and widespread investigation, an experienced police officer was employed to question some of the students. Before questioning them, he advised each one of his rights under Miranda. He questioned 60 or more of the students after giving such warning. No one was placed under arrest or taken to jail or any other place off campus. There was a counselor of the school attendant at each questioning, the record reflecting, without contradiction, that he was there to insure that nothing occurred that the boys would not understand. There is nothing in the record indicating that the defendants were infantile, fearful, unintelligent, coerced, acted involuntarily, were victims of undue influence, "police brutality" or otherwise under any handicap or incapacity to know what was happening or what they were doing. After having been forewarned as stated above, none asked for counsel, but on the contrary, each waived the rights mentioned

1. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and signed a written admission of what part he had played during the power failure.

The State says the trial court erred in arresting judgment on the asserted grounds that the written statements of the defendants were inadmissible under Escobedo and Miranda, since, as the State urges, the defendants were not in custody when questioned by the counselors, and were amply warned of their rights before talking. We agree.

We find nothing showing that the interrogation by the school authorities was accusatory in the Escobedo connotation of that term. It appears to have been nothing dissimilar to that type of inquiry customarily indulged by any principal of any public or private school, military academy, church or other public or private institution whose administrators as a matter of course delve into the circumstances surrounding an incident of moment to the morals, well-being or law-abidance of its students or members. There was no evidence of focusing the injury on any particular suspect, in the Escobedo sense. Certainly the facts do not lend themselves to invocation of Miranda, where one might have been subjected to questioning in some sort of isolation, or in the shadow of the gaol, as it were, as suggested in the language of Miranda itself, where "compulsion to speak in the isolated setting of the police station

may be greater than in courts *or other official investigations where there are often impartial observers to guard against intimidation or trickery."* The counselors in this case certainly were cast in no other role than that of such guardians against oppression or chicanery.

It would seem that the recent case of United States v. Manglona [3] is quite similar *to the instant case, and consonant with* our contentions and conclusions here,—to which the reader is referred.

Mr. Justice Ellett has reported some facts not recited in this opinion to most of which we subscribe.

We think the trial court was in error in arresting judgment, that the question of double jeopardy is not an issue here, and that the matter should be reversed and remanded for a new trial or other appropriate precedure not inconsistent with this decision,—and it is so ordered. (Emphasis added.)

CALLISTER and TUCKETT, JJ., concur.

ELLETT, Justice (concurring and dissenting).

The so-called Miranda and Escobedo rules opened Pandora's box and started courts on a course which completely ignores the question of guilt or innocence

---

3. 414 F.2d 642 (9th Cir. 1969).

in criminal trials and serves as unwarranted shields for guilty criminals. They tend to cause a miscarriage of justice by putting undue emphasis on newly devised procedural rules which are not based upon logic, reason or common sense. These rules should never have been pronounced in the first place and except for the power behind them should not now be followed. Certainly they should not be extended.

As originally pronounced[1] these rules applied to in-custody interrogation by *police officers.* They were not intended to apply to private persons since private persons are not required to give any warning or furnish an attorney before asking questions.[2]

The Intermountain Indian School is a coeducational, off-reservation, boarding school for Indian students. There is nothing in the record to show that any person was compelled to remain in the school against his will. The guidance counselors and other school officials were naturally disturbed by the crimes which had been perpetrated upon young girls attending their school, and they were interested in ascertaining the identity of the guilty parties. None of the school officials or guidance counselors were officers of the law nor were they affiliated in any manner whatsoever with any such officers. They stood in the relationship of in loco parentis to the entire student body, and in that relationship they were not required even by the rules of Escobedo and Miranda to give any advisory warnings or to furnish an attorney before asking questions.

In their investigation they had eliminated from possible guilt all but 60 or 80 of the male student body. They caused these 60 or more young men to be brought before a police officer for further questioning. In each instance a guidance counselor accompanied the boys as they were interrogated to make certain that no advantages were taken of them.

As the boys were taken before the officer they were told by the guidance counselor to tell the truth. Now this advice may sound harsh to the ear of a defense oriented judge who has lost sight of obtaining a just verdict, however, it should be observed that Indian people are noted for telling the truth and for encouraging others to do likewise.

All of the students questioned by the police officer were properly advised of any so-called rights pursuant to the Escobedo and Miranda cases, and there is no claim made by any of the defendants to the con-

1. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. Arizona, 383 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2. Commonwealth v. White, 353 Mass. 409, 232 N.E.2d 335 (Mass.1967); McElroy v. State, 204 So.2d 463 (Miss.1967); Nedrud: The Supreme Court and the Law of Criminal Investigation, p. 189.

trary. They do complain that the school officials did not advise them of their so-called Miranda and Escobedo rights. As was shown above, these defendants were not entitled to such warnings, but no statements made by any of the boys to the school officials or guidance counselors were offered in evidence at the trial. Under questioning of the police officer each of the defendants in this case confessed to his participation in the crimes which had been committed and these confessions were admitted in evidence.

Even if the school officials had been required to give the warnings, such would not be required during the investigatory stage of the proceeding. The fact that more than 60 boys were brought before the police officer shows that the school officials had not at that time begun any accusatory proceedings against the six defendants in this case.

The dissent seems more interested in the sleep of the boys than the rape of the girls. It does not mention the fact that two girls were dragged from under the bed where they were hiding, down a hallway and out onto the grounds, where one of them was raped eight times and the other five times.[3] Nor does it express any concern for the fact that while the girls were being dragged like hogs down the hallway and along the ground, some of the boys were running along beside them poking their fingers inside their private parts until the fingers were bloody.

One should not criticize the school officials for working around the clock to try to find the culprits who committed such dastardly acts. From a student body of 2,000 they eliminated from guilt all but 60 or 80 of the boys, whom they later directed to appear before the officer of the law. No conference with the officer exceeded 40 minutes at most, and most conferences were no more than five minutes in duration of time.

Under the direction of their lawyer each defendant at trial denied that he knew the meaning of the word "rape" and apparently the jury believed them, for despite the fact that each had written in his own handwriting that he had raped one of the girls, not one defendant was found guilty of rape. One was convicted of simple assault, and the others of assault with intent to commit rape. Thus the admission of the confessions into evidence, even if erroneous, would seem to be harmless, since none of the defendants was convicted of the crime to which he had confessed.

After the verdicts were returned, the trial judge said:

> * * * This court feels that it's within the purview of the decisions of the so-

---

3. By the verdicts the jury found that these defendants did not commit the rapes, but there is no question but that someone did.

called Earl Warren Court that no statement, oral or written, can be taken from anyone within these fifty states when the accusatory phase is commenced without the giving of Miranda warnings * *

\* \* \* \* \* \*

\* \* \* As long as I sit here, I will not receive any confessions by any school officer, any peace officer if such be based on a secret, private confession theretofore obtained, without giving the Miranda warning.

It seems to me that the trial judge did not fully understand the so-called Miranda rule, and so I concur in reversing the order made arresting the judgment. However, I dissent from the main opinion insofar as it remands the case for a new trial. These defendants have had their day in court and have been found guilty by a jury of their peers on evidence which was properly received. Another trial is not necessary. The case should be remanded with directions for the trial court to proceed with the imposition of such punishment for each defendant as to him may seem proper and just.

CROCKETT, Chief Justice (dissenting).

Upon the basis of all of the evidence presented at the trial, the trial judge determined it was unfair and improper to use the confessions which had been obtained from the defendants. In reviewing that ruling there are certain basic propositions which should be applied. This court has heretofore indicated that the question as to whether the constitutional rights of an accused were respected is primarily for the trial court to determine;[1] and that the same as with respect to other questions of fact, because of that prerogative, and his advantaged position, we indulge some deference to the determination he has made, and will not upset it so long as there is a reasonable basis in the evidence giving it support.[2]

The questioning of the students was handled in the first phase by the school guidance counselors. The pattern of procedure followed was that when the questioning implicated a student, the suspect was taken before the police officer, and while in the presence of the counselor, for what amounted to a repetition and confirmation of information already obtained.

Because of my belief that the trial court's determination should be sustained, I feel that it is only fair and proper that I state a brief summary of the facts relating to obtaining the confessions, as I see them

1. See State v. Criscola, 21 Utah 2d 272, 444 P.2d 517; and see also Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; Miller v. United States, 8 Cir., 354 F.2d 801.

2. Ibid. One wonders about the application of this rule in this case, particularly in the concurring opinion.

upon a view of the record in the light supporting that conclusion. Reid Barber was roused from his bed at 11:00 p. m., Tuesday, April 9th. He was taken to a room in the main building where he waited for one hour. He talked to someone he did not know and was then allowed to return to his bed. On Wednesday night, April 10th, he was summoned to speak with Counselor Smith and Officer Sneddon. He was read the Miranda warning, and was told by Officer Sneddon, "We'll take you down to jail right now if you don't tell the truth." He says he then gave a statement hoping that if he told the truth he would not go to jail.

Chavez Whitehorse was roused from his bed at 2:00 a. m., Thursday, April 11th. He was taken from one room to another, a total of four in all, and finally questioned by Officer Sneddon and Counselor Edward. Upon the commencement of the interrogation Sneddon told him, "Sit still and be silent!" He flatly denied the charges, but was constantly accused of lying. Some two hours and forty-five minutes after he was roused he finally got back to bed at about 4:45 a. m.

Harry Tsosie was roused from his bed at 10:30 p. m., April 9th, and questioned for three and one-half hours intermittently by Counselor Smith who recorded what he said. At 2:30 a. m. he was taken into the next room where Officer Sneddon was waiting. Sneddon indicated that it was of no use to tell anything other than what he had told Smith because he had just listened to the tape recording of his conversation with Smith, implying that he already had his testimony. Counselor Smith remained present during the questioning while Tsosie made his statement.

Mose Clark was roused from his bed at 11:00 p. m. on Wednesday, April 10th. He waited in a room alone for approximately twenty-five minutes. He was then questioned by Officer Sneddon and Counselors Quayle, Palmer and Speaks. After giving him the Miranda warning, Sneddon told him that he, Sneddon, got off duty at 5:00 a. m. and they would stay up until then if he didn't tell the truth. He then gave his statement.

Harrison Largo was interrogated Thursday evening, April 11th, by Counselors Smith and Palmer. Smith told Largo that if he (Largo) didn't tell the truth he would keep going until he got it. After one hour he confessed to them and was then immediately ushered into the next room where Officer Sneddon was waiting.

Clarence Peter was summoned from a movie on Saturday at 2:00 p. m. He took his girl back to her dorm, made a date with her for later that evening and went to the interrogation building. He waited alone for over four hours. Shortly after 6:00 p. m. he was questioned by Officer Sneddon

and Counselors Speaks and Peter. He flatly denied any participation in the affair, but Sneddon kept going on and told him that they already knew about his role in the affair, and that they would stay until he told the truth. He decided to answer questions affirmatively in an effort to be released so that he would not fail to keep his date with his girl friend.

In reference to the procedure mentioned and the information obtained, I assume that the correctness of the rule of Escobedo v. Illinois,[3] under its particular circumstances: that when the investigation of a crime has passed from the general investigatory phase and becomes focused as an accusation of the crime upon the suspect, he is then entitled to be advised concerning his right of counsel and to have a request he makes in that regard complied with. It is not my desire, nor do I believe proper procedure in the investigation of crime requires, the extension of that ruling beyond fact situations similar to those of that case where there was an "in-custody" interrogation by officers who had him under their domination and control.[4] I note my awareness and approval of authority to that effect.[5]

The critical question here as to the propriety and fairness of the procedure in obtaining the confessions should not be answered solely upon the basis of the questioning of either the school counselors or of the police officers, but whether the two considered together would come within the ambit of the Escobedo rule. In addition to the facts above recited there are certain aspects of the evidence which give support to the trial court's determination. These teenage Indian youths were away from their home environment. They were in effect confined in an institution. The school officials had supervisory and disciplinary control over them. There was testimony to the effect that the school counselors were "the police" of the school. The questioning by those officials was carried out in an atmosphere that the court could well regard as adversarial to them. It is obvious from the trial judge's comments quoted below, particularly the emphasized portions, that he thought the questioning had proceeded beyond the investigatory to the accusatory stage before the warnings were given. In commenting upon the motion in arrest of judgment, after having heard all of the evidence in the case, he made these observations:

3. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

4. See Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311, in which the Supreme Court talked about the Miranda requirement when a person being questioned was "in custody at the station or other-

wise deprived of his freedom of action in any significant way."

5. United States v. Manglona, 414 F.2d 642 (9 Cir. 1969); Minor v. State, 6 Md. App. 82, 250 A.2d 113; People v. Crabtree, 239 Cal.App.2d 789, 49 Cal.Rptr. 285.

Gentlemen * * * on the proposition that the state or the federal government can, after first extracting an oral confession from a defendant, in this case by guidance counselors * * * forget about the oral confession and take a man in the next room, where a police officer is seated, who for the first time reads from the card (the Miranda warning) and advises the defendant of his rights. This court feels that it's within the purview of the decisions * * * that no statement, oral or written, can be taken from anyone * * * *when the accusatory phase is commenced without the giving of the Miranda warnings.* In this case *the guidance counselors did not give the Miranda warnings to these boys when the first oral statements and confessions were obtained.* In this court's view * * *the statements obtained by the officer were so tainted* and muddled up that they couldn't be said to be free and voluntary. [Emphasis added.]

There appears to be considerable merit in the argument that approval of the procedure here followed would provide a method for circumventing the requirement of safeguarding the constitutional rights of an accused. It is my judgment that if proper deference were allowed to the prerogatives of the trial court, his exclusion of the confessions would be justified, and I am not persuaded that it should be overturned.

Notwithstanding the conclusion just stated, I am in accord with the position of the prosecution that the defendants would not in any event be entitled to an outright release under a permanent arrest of judgment. When an error of the character here under consideration has been committed, what the defendants are entitled to is a new trial in the absence of that error.[6] It comports with neither law, justice nor common sense for one who is accused of committing a serious crime to go free merely because someone made a mistake. In a situation such as this, even though the motion in arrest of judgment was granted, the rule of double jeopardy does not bar further proceedings.[7] It may be true that it would be difficult, or the district attorney or the trial court may think it impossible, for the State to make a case against the defendants without confesssions. But on the basis of the record before us we have no certain knowledge of that fact. Accordingly, the proper disposition of this case would be to remand it for such further proceedings, if any, as may seem advisable in the premises but honoring the ruling the trial court made as to the confessions.

6. Cf. State v. Lawrence, 120 Utah 323, 234 P.2d 600; and see Orozco v. Texas, supra.
7. See 21 Am.Jur.2d 509, Crim.Law, Sec. 524; State v. Stephenson, 69 Kan. 405, 76 P. 905 (1904); People v. Allen, 252 Mich. 553, 233 N.W. 412 (1930); State v. Moore, 93 N.H. 169, 37 A.2d 15 (1944); State v. Faulkner, 241 N.C. 609, 86 S.E. 2d 81.