THE STATE OF MONTANA EX REL. ARNOLD A. BERGER, SPECIAL ASSISTANT COUNTY ATTORNEY OF BIG HORN COUNTY, MONTANA, RELATOR, *v.* THE DISTRICT COURT OF THE THIRTEENTH JUDICIAL DISTRICT OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF BIG HORN, AND THE HONORABLE E. E. FENTON, PRESIDING JUDGE, RESPONDENT.

No. 11376.
Submitted September 7, 1967. Decided September 28, 1967.
Rehearing denied October 17, 1967.
432 P.2d 93.

Arnold Berger (argued), Billings, for relator.
Charles F. Moses (argued), Billings, for respondent.

PER CURIAM.

This is an original proceeding brought by the prosecuting attorney of Big Horn County for a writ of supervisory control seeking this court's jurisdiction to reverse an order of the District Court of July 28, 1967, in District Court Cause 962, State of Montana v. Clara Thomas and Robert G. Thomas. The order referred to suppressed a certain oral statement made by defendant Clara Thomas as will appear hereinafter. The order was made by the District Judge granting a motion of the defense to suppress.

On June 7, 1967, this court in an order and memorandum ruled that the district court was in error in suppressing a written statement used in a previous trial. (See State v. Thomas, 147 Mont. 325, 327, 328, 413 P.2d 315, for the written statement, and see our Order and Memorandum reported in State ex rel. Anderson v. District Ct., 149 Mont., 429 P.2d 633.) (We also note that our Order was the subject of an application by Clara Thomas to enjoin the use of the written statement in the United States District Court, Billings Division, in Civil Cause No. 669. Therein the Court in an Order and Memorandum opinion reported in 24 St. Rep. 541 declined jurisdiction because State procedures had not been completed.)

The oral conversations or statements, the subject of the instant application, were made prior to the written statements

referred to above. A hearing was had before the district judge, a transcript of the proceedings made, findings of fact and conclusions of law made, and the order herein referred to resulted.

We issued an order to show cause directed to the district court, such order being in the alternative to either vacate the order or appear and show cause why it was not vacated. A return and answer were filed and oral argument had.

Basically two issues were argued. The first that our previous decision as to the written statement is the law of the case. We shall not dwell upon this. The second, that the motion to suppress the oral statement was improperly granted because the testimony demonstrated that the oral statement was voluntarily made by Clara Thomas at a time prior to any "focus" as a particular suspect; and that, furthermore she was properly advised of her constitutional rights and knowingly and intelligently waived them.

To relate the fact situation with as much brevity as possible we shall quote the trial court's findings one through ten:

"1. The Information herein charges the defendants with Murder in the Second Degree committed by killing Frank Tschirgi on or about the 10th day of March, 1963.

"2. The official investigation of the death of Frank Tschirgi was conducted by Roy G. Reilly, the then Sheriff of Big Horn County, Montana, commencing on the morning of March 11, 1963, and on the afternoon of that date said Sheriff became convinced that death was not caused by suicide, that Frank Tschirgi had been shot by some other person, and that his death was caused by two gunshot wounds in his breast.

"3. That said Sheriff interviewed all of the persons who, on either March 10, 1963, or March 11, 1963, were present on the ranch where the death occurred, and he arrived at the conclusion that none of these persons interviewed by him had any connection with the death of Frank Tschirgi.

"4. That Clara Thomas was present on the above-mentioned

ranch on March 10, 1963, but she was not present there when the Sheriff arrived on the morning of March 11, 1963, and that the Sheriff was then informed that she had been taken to a hospital at Sheridan, Wyoming, because of having taken sleeping pills.

"5. That during said investigation a Mrs. Jackson, 'the last person to see Frank Tschirgi alive,' related to the Sheriff a conversation she had had with the deceased on the evening of March 10, 1963, and stated to the Sheriff that as Frank Tschirgi was leaving her home he told her he was going to see Clara about a dog; that Mr. Reilly was uncertain whether, in relating another part of this conversation to him, Mrs. Jackson's exact words were that 'Frank Tschirgi told her that he was going over to fight with the damn sister', and that he did not know whether the word 'damned' or the word 'fight' was used by her.

"6. That on March 12, 1963, Sheriff Reilly stated to Robert G. Thomas and David Thomas that he wished to talk to Clara Thomas and asked them when it would be possible to talk to her; that he also talked with them about Frank's passing and according to his best recollection of the conversation they said, 'Yes, when Clara gets well she wants to tell you.' That on March 13, 1963, Robert G. Thomas called Sheriff Reilly by telephone and informed him that he could talk to Clara Thomas.

"7. That Clara Thomas had not authorized Robert G. Thomas to call the officers and tell them they could question her, that Robert G. Thomas had no conversation with her concerning the interview by Mr. Reilly and Mr. Wilson, and that she had no knowledge of such interview prior to the arrival of the officers at the hospital.

"8. That following said telephone call, Mr. Reilly and Robert H. Wilson, the then County Attorney of Big Horn County, Montana, went to Sheridan, Wyoming, arriving at the hospital between five and six o'clock on the afternoon of March 13,

1963; that after a conversation in the hospital with Robert G. Thomas and David Thomas, the Sheriff and County Attorney went to the room of Clara Thomas, and Mr. Wilson told her that they were down there investigating the death of Frank Tschirgi, 'and he told her of her rights, that she didn't have to say anything if she didn't want to and that she could have the aid of an attorney.'

"9. That at the time she was questioned in the hospital by the Sheriff and County Attorney, Clara Thomas had not been placed under arrest and was not in official custody, but that she was confined as a patient in the hospital where she had been in a state of unconsciousness, and that the progress of her recovery was such on the morning of the day on which she was interrogated her attending physician then stated that if she made normal progress he felt she would be coherent enough or recovered enough to answer some limited questions.

"10. That neither the said County Attorney or the Sheriff informed Clara Thomas that she had the right to have a lawyer present with her during their interrogation, and that she was not informed by either said County Attorney or said Sheriff that if she was indigent a lawyer would be provided for her prior to any interrogation."

Finding No. 11 was as follows:

"That, as testified by Mr Reilly, he did not have any knowledge of who had killed Frank Tschirgi, but that his investigation had disclosed nothing that would suggest any incrimination of any person who was present at the ranch at the time of the homicide, other than Clara Thomas; and that by reason of the incriminating circumstances pointing to Clara Thomas, hereinbefore set forth in these Findings, together with the fact that the Sheriff's investigation had revealed no reason to suspect any other person, his investigation was then necessarily focused upon Clara Thomas."

That portion of Finding No. 11 concluding that the investigation had necessarily "focused" upon Clara Thomas is what

we find erroneous. This so-called finding of fact is necessarily a conclusion of law based upon the District Court's concept of the meaning of the United States Supreme Court's decisions in the Escobedo and Miranda cases which will be hereinafter discussed.

First, it is clear that Clara Thomas was not "in custody" in any legal sense of the word. Nor do we find that the defendant, at the time, was otherwise deprived of her freedom of action in any significant way. Finding No. 9 above-quoted does no more than suggest that confinement as a patient might somehow have limited her action in a significant way, but we find otherwise. Indeed, however, our specific inquiry narrows down to, not whether Clara Thomas was confined or her action limited in any significant way; but rather whether in the investigatory process the "accusatory stage" or "focus" had been reached.

In Escobedo v. State of Illinois, 378 U.S. 478, 490, 84, S.Ct. 1758, 1765, 12 L.Ed.2d 977, the court said:

"We hold, therfore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect *has been taken into police custody,* the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not affectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. 335, at 342, 83 S.Ct. 792, at 795, 9 L.Ed.2d 799 and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

In Miranda v. State of Arizona, 384 U.S. 436, 444, 457, 86

S.Ct. 1602, 1612, 1619, 16 L.Ed.2d 694, 10 A.L.R.3d 974, the Court said:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * *

"The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned *while in custody or otherwise deprived of his freedom of action in any significant way*. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admitted at their trials. They all thus share salient

features—incommunicado interrogation of individuals *in a* *police-dominated atmosphere* resulting in self-incriminating statements without full warnings of constitutional rights. (Emphasis added.) * * *

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."

We narrow our inquiry here because, with the findings and conclusion of the district judge a well-written memorandum was filed and made available to us. The judge dwelled upon the position of the prosecution in this manner:

"It is the position of the prosecution that Miranda v. State of Arizona, and Escobedo v. State of Illinois, 378 U.S. 487, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977, are to be construed as holding that, before interrogating a person suspected of crime, the officers of the law are legally bound to protect the constitutional rights of the suspect by giving him the above-quoted warning—if he has been taken into custody; but that the same officers, interrogating the same person, suspected of the same crime are not legally bound to protect the constitutional rights of the suspect by giving him the above-quoted warning, or any warning—if the suspect has not been taken into custody. This position of the prosecution gives to the officer the power to either grant or withhold the constitutional rights of the suspect, depending upon whether the officer elects to

interrogate before or after taking the suspect into official custody.

"It is the view of the undersigned that no such arbitrary and capricious standard was intended by the United States Supreme Court as the test for granting or withholding constitutional rights, and that any suspect questioned by the officers when an official investigation is focused upon that suspect, is entitled, even though he or she is not in custody, to the same warning and the same constitutional rights as the suspect who has been taken into custody."

The court then went on to reason that the interrogation had "focused" on Clara Thomas and that since the "magic words" of *Miranda* were not spoken the oral statements became inadmissible as evidence and thus were suppressed.

At the hearing on the motion to suppress, the sheriff was examined in great detail concerning his investigation. Defense counsel was obviously trying to have the sheriff eliminate all other suspects than Clara Thomas, so that finally when the sheriff and county attorney interviewed her, the "focus" had been achieved under the Escobedo and Miranda rules.

In Miranda, supra at p. 477 of 384 U.S., at p. 1629 of 86 S.Ct., the court said:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. State of Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, 986. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."

The sheriff testified, in response to questions by the prosecution, that:

"Q. Then the following day, the 12th, after you had reached some tentative conclusion that he was shot by other than or killed by other than self inflicted wound, you then proceeded to the ranch to commence your investigation to carry it forth, is that right? A. That is true.

"Q. Now as you talked to the various persons you apparently eliminated them in your mind, did you not, as perpetrators of the deed, is that correct? A. Yes, to a certain extent I did.

"Q. At least you found nothing in anything any of them had said that would be suggestive of incrimination of that particular individual, did you? A. No, I didn't find out anything.

"Q. And this includes David and Robert Thomas too when you talked with them? A. That's right.

"Q. And for all practical purposes at those times you had no reason to suspicion them, did you? A. No.

"Q. Now did that same thing prevail, I mean was your attitude the same when you went to talk to Clara Thomas up until the time that she had made certain admissions to you? A. Yes. I don't know, didn't have any idea who.

"Q. In other words there are hundreds of thousands of other people that could have committed this offense as far as you were concerned up until that time, is that right? A. That's right.

"Q. And you had, and you were doing this investigation to see if anybody knew anything about it? A. That's right."

To accept the district court's finding No. 11 would be to say that the last person questioned in an investigation would be the "focal" one. Up until Clara's statement, the officers were groping for information, narrowing the field it is true; but certainly not achieving a "focus" in a "police dominated atmosphere"; nor in any manner coercing a statement. This, we feel is just a part of the "inquiry of persons not under restraint" as discussed in Miranda.

138

In this opinion, we have not attempted to fully discuss rules pronounced in Escobedo and Miranda. Indeed, as we read those cases, the standard involved still remains whether or not the statement was voluntarily made in an intelligent manner, or put another way whether any coercion was used to overcome the freedom of choice.

We find then that the district court was in error in ordering the oral statements suppressed, and that a writ of supervisory control should issue; such writ to set aside the order of suppression.

It is so ordered.