## WILLIAM RALPH CUMMINGS *v.* STATE OF MARYLAND

[No. 1015, September Term, 1974.]

*Decided July 1, 1975.*

362

The cause was argued before MORTON, THOMPSON and MOYLAN, JJ.

*Alexander R. Martick, Assigned Public Defender,* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Milton B.
Allen, State's Attorney for Baltimore City,* and *H. Gary
Bass, Assistant State's Attorney for Baltimore City,* on the
brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Myriad cases have dealt with the issue of whether
*Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d
694 (1966), has been complied with. The convictions now
under review — those of William Ralph Cummings by a
Baltimore City jury presided over by Judge Shirley B. Jones
for automobile manslaughter and related traffic offenses —
deal with the somewhat rarer threshold issue of whether
*Miranda* is applicable.

A prefatory word is in order to keep the constitutional
question straight. There is not — under the Fifth
Amendment to the Federal Constitution [1] or under Article
22 of the Maryland Declaration of Rights [2] — any such thing
as a right against self-incrimination. There is only a right
against *compelled* self-incrimination.

The distinction was elegantly made by former Chief
Justice Weintraub for the Supreme Court of New Jersey in
*State v. McKnight,* 52 N. J. 35, 52-53, 243 A. 2d 240 (1968):

"There is no right to escape detection. There is no
right to commit a perfect crime or to an equal
opportunity to that end. The Constitution is not at
all offended when a guilty man stubs his toe. On
the contrary, it is decent to hope that he will. Nor is
it dirty business to use evidence a defendant
himself may furnish in the detectional stage . . . .
[A]s to the culprit who reveals his guilt unwittingly

1. The Fifth Amendment provides, in pertinent part:
"[No person] shall be *compelled* in any criminal case to be a
witness against himself . . ." (Emphasis supplied)
2. Article 22 provides:
"That no man ought to be *compelled* to give evidence against
himself in a criminal case." (Emphasis supplied)

with no intent to shed his inner burden, it is no more unfair to use the evidence he thereby reveals than it is to turn against him clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left. . . . It is consonant with good morals, and the Constitution, to exploit a criminal's ignorance or stupidity in the detectional process."

*Miranda,* in precise terms, was aimed not at self-incrimination generally (even in response to police interrogation) but at *compelled* self-incrimination — the inherent coercion of the custodial, incommunicado, third-degree questioning process. Its holding was set out at 384 U. S. 444:

"Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*" (Emphasis supplied)

A scanning of *Miranda* makes its thrust preeminently clear. "The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world." *Ibid.*, at 384 U. S. 445. *Miranda* pointed out that all of the four cases being dealt with in that umbrella opinion "share salient features — incommunicado interrogation of individuals in a police-dominated

atmosphere . . ." *Ibid.*, at 445. It pointed out that the major danger of the "in-custody interrogation" is that its incommunicado character obscures a later judicial determination of what really transpired. "An understanding of the nature and setting of this in-custody interrogation is essential to our decisions today. The difficulty in depicting what transpires at such interrogations stems from the fact that in this country they have largely taken place incommunicado." *Ibid.*, at 445. "Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." *Ibid.*, at 448. It speaks of " *'privacy* — being alone with the person under interrogation,' " *ibid.*, at 449, of the police tactic that the "subject should be deprived of every psychological advantage," *ibid.*, at 449, of an "atmosphere" that "suggests the invincibility of the forces of the law," *ibid.*, at 450, and of the psychological ploy of the police "[t]o highlight the isolation and unfamiliar surroundings . . ." *ibid.*, at 450. It speaks of the custodial interrogation as one where a suspect may be deprived of the moral support of family and friends, contrasting it with his home where "his family and other friends are nearby, their presence lending moral support," *ibid.*, at 450.

"Even without employing brutality, the 'third degree' or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Ibid.*, at 455-456. "In the cases before us today, given this background, we concern ourselves primarily with this interrogation atmosphere and the evils it can bring." *Ibid.*, at 456. *Miranda* pointed out that the environment of the custodial interrogation was frequently designed to produce a confession. "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation." *Ibid.*, at 457.

*Miranda* made it very clear that the warnings it mandated

and the waiver it required were "employed to dispel the compulsion inherent in custodial surroundings." *Ibid.*, at 458. The evil at which the prophylactic devices of *Miranda* were aimed was made very clear. "An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." *Ibid.*, at 461.

The Supreme Court decisions, post-*Miranda*, have not deflected its initial thrust. In *Mathis v. United States*, 391 U. S. 1, 88 S. Ct. 1503, 20 L.Ed.2d 381 (1968), the warning and waiver requirements of *Miranda* were held to apply to a custodial interrogation by the police, where the questioned suspect was in custody (literally in jail) for another offense not connected with the subject of the interrogation. It was held that this latter fact did not alter the inherently coercive character of the custodial surroundings. In *Orozco v. Texas*, 394 U. S. 324, 89 S. Ct. 1095, 22 L.Ed.2d 311 (1969), the warning and waiver requirements of *Miranda* were held applicable to a police interrogation conducted at the defendant's home. In that case, four police officers burst into the suspect's boarding house bedroom while he was asleep at 4 o'clock in the morning. One officer made it clear that the suspect "was not free to go where he pleased but was 'under arrest'." 394 U. S. at 325. The Supreme Court found that the interrogation there was custodial in nature because "[a]ccording to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning." *Ibid.*, at 327.

The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto, compelled* self-incrimination because of the inherent coercion — the inherent compulsion — of the custodial interrogation environment. In the custodial interrogation situation, therefore, the constitutionally

damning element of compulsion can only be extirpated by the elaborate prophylactic process of warning and waiver prescribed by *Miranda* as the required compulsion antidote. Absent the compulsion, there is no need for the antidote.

In addressing a *Miranda* problem, a court has before it four potential issues: the questions of 1) custody, 2) interrogation, 3) warnings and 4) waiver. The first two questions deal with the applicability of *Miranda;* the second two deal with compliance with *Miranda.* A court must ask:

1. Was there CUSTODY?
2. Was the statement under scrutiny made in response to INTERROGATION?

The answer to both of the foregoing questions must be in the affirmative before *Miranda* is even applicable. Only in the event that Custody and Interrogation are found to have been present does a court move on to consider the two questions determining whether there has been compliance with *Miranda:*

3. Were there adequate WARNINGS?
4. Was there an adequate WAIVER?

As we approach the analysis of the instant case, it may be helpful to make explicit the focus of our review:

1) The appellant and the appellee have commendably narrowed the issue before us. In looking at the admissibility of several admissions in this case, we are concerning ourselves exclusively with the question of whether there was a *Miranda* violation. We are not dealing with the broader issue of voluntariness.

2) We are concerned exclusively with the correctness of Judge Jones's decision in admitting the several admissions into evidence. At the very outset of the trial, the jury was excused from the courtroom and a hearing was held before Judge Jones alone on the admissibility of the statements now in issue. Two witnesses, Officer Robert Hall and Mrs. Ruby Cummings, were heard. This proceeding is recorded on pages 20 through 93 of the trial transcript. At the end of that hearing, Judge Jones made her ruling on the question of

admissibility and the jury was brought back into the room. Our review is confined to the facts developed at that hearing.

In order that the jury might give proper weight (or no weight at all) to the admissions, the same factual question was explored before them. Officer Hall testified during the State's case in chief on the circumstances surrounding the giving of the admissions. During the defense case, Mrs. Cummings also again testified on this subject. In addition, the appellant, who had not testified on the subject during the admissibility hearing, gave testimony before the jury. Although we are not aware of any significant discrepancies between the two versions, we are, on this issue, deliberately factoring out any testimony on this subject at the trial upon the merits in the presence of the jury as immaterial.[3] Although the ground may have been reploughed for other purposes at a later time, we are confined (and we so confine ourselves) to the adequacy of the first ploughing.

3) We are looking exclusively to the question of whether *Miranda* was applicable to the hospital room interview in this case. Because we conclude that it was not, we do not reach the question of whether *Miranda* was complied with. Under our analysis, any question of whether the appellant affirmatively requested a lawyer, on the one hand, or whether he waived any such possible request in voluntarily proceeding with the interview, on the other hand, is moot. We are looking primarily at the threshold question, "Was there Custody?", and, in one auxiliary aspect, at the follow-up question of, "Was there Interrogation?"

---

**3.** Indeed, even had some facts been developed before the jury which might have derogated from admissibility had they come earlier, it would have been palpably impossible to strike from the jurors' minds the admissions of which they had already learned "The moving finger writes, And, having writ, moves on. . . ." Absent a defense motion for a mistrial, moreover, a judge would be out of order in declaring one *sua sponte*, because he might thereby preclude a future retrial on the ground that a lack of manifest necessity placed the defendant unnecessarily in double jeopardy. In reviewing Judge Jones's decision on admissibility, we will confine ourselves scrupulously to the facts available to her when she was called upon to make that decision.

## The Facts in This Case

On May 4, 1974, at approximately 7 p.m., a vehicular accident occurred in the 2600 block of Annapolis Road in Baltimore City. A trailer-truck, owned by the appellant and occupied by him and two other men (Clarence Martin and Larry Hoyle), was northbound on Annapolis Road. Coming down a hill, it failed to negotiate a turn and slid into the southbound lane, striking a southbound Cadillac driven by Mrs. Rose Marie Davis and occupied by herself and nine other persons. Mrs. Davis's daughter, Sandy Davis, aged four, died within the hour as a result of head injuries sustained in the collision. After striking the Cadillac, the truck continued to move to its left, hit a parked car, collided with a fence and turned over on its side. The appellant was removed from the cab of the truck and taken to the hospital. The posted speed in the 2600 block of Annapolis Road was thirty miles per hour.

Officer Hall, investigating the accident, attempted to visit the appellant at the South Baltimore General Hospital on the night of the accident, but was unable to see him on doctor's orders. Officer Hall returned to the hospital the following day, May 5, at approximately 12:15 p.m. and interviewed the appellant. At issue are several admissions made by the appellant during the course of that interview.

## Was There Custody?

We will discuss various details of the May 5th interview of the appellant at the South Baltimore General Hospital as they become relevant in considering the various factors that make for custody or lack thereof in a given interrogation. Our holding is that the interrogation was non-custodial in nature, so that *Miranda* is inapplicable and compliance therewith is moot.

### A. The Place of Interrogation

Although the place of interrogation is not the conclusive or sole factor to be considered in determining the fact of custody, it is a vital factor. The consensus of American case

law is that the questioning of a suspect who is confined in a hospital but who is not under arrest is not a custodial interrogation within the contemplation of *Miranda*. In *Tillery v. State*, 3 Md. App. 142, 146-147, 238 A. 2d 125, 127-128 (1968), we held that the absence of *Miranda* warnings in a hospital interrogation was immaterial because the interrogation was non-custodial.[4] The defendant there was not under police restraint. In *State v. Zucconi*, 50 N. J. 361, 235 A. 2d 193 (1967), the Supreme Court of New Jersey held that a hospital room questioning of a person suspected of having driven a car involved in a fatal accident was non-custodial. In *State v. District Court*, 432 P. 2d 93 (Mont. 1967), an interrogation of a prime murder suspect where she was undergoing treatment for an overdose of sleeping pills was held to be non-custodial.

In *People v. Gilbert*, 8 Mich. App. 393, 154 N.W.2d 800 (1967), the police were investigating an automobile accident which had resulted in a death. They observed that the defendant smelled of alcohol, but they did not question him at the accident scene. He was questioned, less than an hour later, in a hospital emergency room. He admitted having been the driver of the car; he also admitted being drunk. No *Miranda* warnings had been given. In holding that the interrogation was non-custodial, the court said, at 154 N.W.2d 801:

> "The history of the transition from physical to more subtle psychological means of compulsion was traced in detail by the Court. In each of the 4 cases consolidated for appeal in *Miranda*, the confession or admission was made after formal arrest and in a general atmosphere of psychological compulsion. Repeatedly the Court stressed the factor of 'incommunicado interrogation' resulting in a

---

**4.** *Thomas v. State*, 3 Md. App. 101, 238 A. 2d 558 (1968), did, to be sure, reject a confession given without *Miranda* warnings in a hospital. That case, however, uncritically proceeded directly to the question of compliance with *Miranda* and gave no consideration to the question of the custodial nature of the interrogation and to the general applicability of *Miranda* in the first instance. It is, perforce, no precedential authority for a point which it never considered.

'police-dominated atmosphere.' The lengthy duration of the interrogation period was considered significant in several of the cases. The requisite 'custodial interrogation' must be interpreted in the light of the Court's own emphasis upon the compulsive atmosphere in which the suspect is questioned. In the instant case the defendant was questioned as he freely walked about the hospital corridors and emergency room. He was in no way isolated for questioning and the period of interrogation was of short duration. This Court will not extend the requirements of *Miranda, supra,* to the essentially different fact situation in the instant case."

In *State v. Sandoval,* 92 Idaho 853, 452 P. 2d 350 (1969), a policeman and a prosecutor questioned an automobile manslaughter suspect, on whom the investigation had definitely focused, as he lay in his hospital bed. In holding the confrontation to have been non-custodial, the Supreme Court of Idaho said, at 452 P. 2d 355:

"Defendant was not under arrest; the authorities did nothing to restrain his freedom of action; the questioning took place in a hospital room; another patient was present. Clearly Sandoval was not in custody, either actually or constructively. Hence the *Miranda* and *Escobedo* exclusionary rules are inapplicable."

In *State v. Kelter,* 426 P. 2d 500 (Wash. 1967), an automobile manslaughter suspect, on whom the investigation had focused, was interrogated in his hospital room where he was recovering from his injuries. In holding tht the interrogation was non-custodial, the Supreme Court of Washington said, at 501:

"In the present case, there was no compelling atmosphere of in-custody interrogation in the questioning of the defendant in his hospital room; and no competent evidence was offered to show

> that the defendant was not in full possession of his faculties at this time; nor had the defendant been placed under arrest or otherwise restrained by the police in any manner."

In *People v. Phinney*, 22 N.Y.2d 288, 239 N.E.2d 515 (1968), Chief Judge Stanley Fuld of the New York Court of Appeals held that a question put to an injured suspect in a hospital emergency room, the answer to which established that the boy was the driver of the car involved in an accident, was a non-custodial interrogation. He stated, at 239 N.E.2d 516-517:

> "A person, not actually placed under arrest, is not deemed in custody when questioned by the police unless 'the questioning takes place under circumstances which are likely to affect substantially the individual's 'will to resist and compel him to speak where he would not otherwise do so freely'.' ... In the case before us, after speaking with the defendant's father, the police officer asked the defendant a single question, wrote out a summons and left. That was the extent of the interrogation and, quite obviously, it was not the sort of 'incommunicado police-dominated atmosphere' or custodial interrogation at which the *Miranda* rule is aimed."

And see *Lamb v. United States*, 414 F. 2d 250 (9th Cir. 1969) ("Lamb was not placed under arrest, or even told that he could not leave the hospital"); *United States v. Quinones-Gonzalez*, 452 F. 2d 964 (10th Cir. 1971); *State v. Mitchell*, 163 N.W.2d 310, 315-316 (Minn. 1969); *State v. Lopez*, 79 N. M. 282, 442 P. 2d 594, 598-599 (1968); *State v. Hoskins*, 193 N.W.2d 802, 813-814 (Minn. 1972); *People v. Reeder*, 276 N.E.2d 768 (Ill. App. 1971).

## B. The Time of Interrogation

Another factor that bears upon the question of custody is whether the interview is conducted during normal business hours or is conducted at an odd hour of the night. See *Orozco*

*v. Texas,* supra. See also Zagel, *Confessions and Inter-rogations After Miranda* (Chicago, 1972) 24. The hospital interview in the present case was conducted in the middle of the day, at approximately 12:15 p.m. This fact, though not itself conclusive, helps tilt the interview in question toward the non-custodial side of the spectrum.

## C. Persons Present During Interrogation

*Miranda* stresses the coercion inherent in being "isolated," held "incommunicado," and being "cut off from the outside world." 384 U. S. at 445. It follows that the presence of friends or neutrals at an interview is a fact of some relevance. 384 U. S. at 461, 478 n. 46. *Miranda* speaks of a suspect being "surrounded by antagonistic forces." 384 U. S. at 461.

Officer Hall was accompanied to the appellant's hospital room by Officer Custis. The fact that the two officers were in uniform does not render the interview custodial. *State v. Hall,* 468 P. 2d 598 (Ariz. App. 1970); *People v. Rodney P.,* 233 N.E.2d 255 (N.Y. 1967); *State v. Meunier,* 224 A. 2d 922 (Vt. 1966). The appellant's wife and a third person were in the room when the officers arrived. Initially, they were asked to leave the room. Within minutes, however, and before any interrogation took place, the officers learned that the lady in question was the appellant's wife and immediately asked her back into the room. She came back and remained present for the entire interview.

A number of courts have considered the presence of friends and relatives as indicative of non-custodial interrogation. *Archer v. United States,* 393 F. 2d 124 (5th Cir. 1968) (suspect's husband); *State v. Noriega,* 433 P. 2d 281 (Ariz. App. 1967) (suspect's family); *State v. Tellez,* 431 P. 2d 691 (Ariz. App. 1967) (suspect's friends); *Stout v. State,* 426 S.W.2d 800 (Ark. 1968) (suspect's wife); *People v. Butterfield,* 65 Cal. Rptr. 765 (Cal. App. 1968) (suspect's mother); *State v. Davis,* 157 N.W.2d 907 (Iowa 1968) (doctor and nurses); *People v. Allen,* 281 N.Y.S.2d 602 (N.Y.App. 1967) (suspect's family); *Commonwealth v. Barclay,* 240 A. 2d 838 (Pa.App. 1968) (suspect's wife and other persons);

*United States v. Owens,* 431 F. 2d 349 (5th Cir. 1970) (friends); *State v. Largo,* 473 P. 2d 895 (Utah 1970) (school counselors).

Maryland has considered the presence of family or friends as a factor bearing on the issue of custody vs. non-custody. *Jones v. State,* 2 Md.App. 429, 432, 234 A. 2d 900 (1967) (suspect's girlfriend); *McFadden v. State,* 1 Md. App. 511, 519, 231 A. 2d 910 (1967) (suspect's common-law wife).

Conversely, the deliberate removal of a suspect from the presence of his family and friends tends to support a finding of custody. *Commonwealth v. Sites,* 235 A. 2d 387 (Pa. 1967); cf. *Pemberton v. Peyton,* 288 F. Supp. 920 (E.D.Va. 1968). And see *Zagel, op.cit.,* 24-25.

There was simply no effort in the present case to sweep the appellant into an unfamiliar, isolated or incommunicado setting, cut off from the reassuring presence of his wife.

### D. The Indicia of Formal Arrest

The existence of physical restraint has almost invariably led to a finding of custody. *United States v. Averell,* 296 F. Supp. 1004 (E.D.N.Y. 1969); *State v. Saunders,* 435 P. 2d 39 (Ariz. 1967); *People v. Connor,* 75 Cal. Reptr. 905 (Cal.App. 1969); *People v. McKay,* 287 N.Y.S.2d 795 (N.Y.App. 1968); *Commonwealth v. Moody,* 239 A. 2d 409 (Penn. 1968); *Roybal v. People,* 496 P. 2d 1019 (Colo. 1972).

In *Myers v. State,* 3 Md. App. 534, 538, 240 A. 2d 288 (1968), Chief Judge Murphy held for this Court that placing a suspect in a police car and interrogating him as that car moved toward police headquarters constituted such physical restraint as to amount to custody within the contemplation of *Miranda. Myers* cited *Gaudio v. State,* 1 Md. App. 455, 468, 230 A. 2d 700 (1967), which had noted "that the evils with which the *Miranda* court was primarily concerned were: (1) the holding of a defendant incommunicado in an isolated setting; (2) sweeping him from familiar surroundings into police custody; (3) surrounding him with antagonistic forces; and (4) subjecting him to techniques of persuasion." 3 Md. App. at 537.

Conversely, the absence of physical restraint tends to indicate non-custody. *People v. Merchant,* 67 Cal. Rptr. 459 (Cal. App. 1968); *United States v. Gallagher,* 430 F. 2d 1222-1224 (7th Cir. 1970); *People v. Cartwright,* 182 N.W.2d 811 (Mich.App. 1970); *People v. Burris,* 273 N.E.2d 605 (Ill. 1971); *People v. Robinson,* 177 N.W.2d 234 (Mich. App. 1970).

In the present case, there was no physical restraint imposed by the police whatsoever. The appellant was bedridden, to be sure, but this was an internal circumstance and not an external restraint. The appellant had not been charged or arrested. There was no guard placed on the door. The police did not in any way interfere with his freedom of movement or his autonomy within his hospital room.

It has been held in a number of cases that the presence or absence of fingerprinting, photographing and other booking procedures have a bearing on the question of custody, *Hicks v. United States,* 382 F. 2d 158 (D.C. Cir. 1967); *People v. Ellingsen,* 65 Cal. Rptr. 744 (Cal. App. 1968). In the instant case, there was no hint of fingerprinting, photographing or any other booking procedure.

It has similarly been held that telling a suspect that he is under arrest indicates custody for *Miranda* purposes. *Duckett v. State,* 3 Md. App. 563, 240 A. 2d 332 (1968); *Franklin v. State,* 6 Md. App. 572, 252 A. 2d 487 (1969). And see *Johnson v. Commonwealth,* 160 S.E.2d 793 (Va. 1968); *United States v. Diaz,* 427 F. 2d 636 (1st Cir. 1970); *State v. Myers,* 487 P. 2d 663 (Ore.App. 1971). Conversely, the fact that an officer does not tell a suspect that he is under arrest is a circumstance tending to negate custody. *State v. Caha,* 165 N.W.2d 362 (Neb. 1969). In the present case, the defendant was not under arrest, was never told that he was under arrest and had no reason to believe that he was under arrest. There were, in short, no indicia of formal arrest.

## E. The Gratuitous Giving of Miranda Warnings

Notwithstanding our conclusion that the hospital interview here in question was non-custodial within the contemplation of *Miranda,* Officer Hall did give *Miranda*

warnings to the appellant. This raises the question of whether the gratuitous and unnecessary giving of *Miranda* warnings will operate to convert an otherwise non-custodial situation into a custodial one. The answer is no. In dealing with a similar situation in *United States v. Owens,* 431 F. 2d 349 (5th Cir. 1970), the United States Court of Appeals said, at 352:

> "By gratuitously advising Owens of his rights, the agent in no way conferred additional rights on him. The statements that were made were voluntarily offered in response to proper questions in an atmosphere free from actual or implied coercion and were therefore properly admitted into evidence."

Under similar circumstances in *United States v. Akin,* 435 F. 2d 1011 (5th Cir. 1970), the Court of Appeals said, at 1013:

> "The only basis suggested by appellant for finding that there was 'custodial interrogation' in this case is that the FBI did give some warning to appellant prior to questioning him. Thus, appellant asks, 'If this were *not* a custodial interrogation, why would the agents give warnings?' We cannot accept appellant's suggestion. To rule that an FBI agent's extra-cautious efforts to inform a person his constitutional rights converts an otherwise non-custodial situation into 'custodial interrogation' could easily work to defeat one of the Supreme Court's main objectives in *Miranda,* the objective of encouraging law enforcement agencies to develop ways of protecting individual rights that are in harmony with effective law enforcement. We conclude, therefore, that a custodial situation cannot be created by the mere giving of modified *Miranda* warnings."

And see *State v. McLam,* 478 P. 2d 570 (N.M.App. 1970).

### F. The Length and Mood of the Interrogation

The cases hold that the brevity of an interrogation, the

friendly demeanor of the officer and the short and neutral nature of the inquiries all tend to negate the notion of custody. *Allen v. United States,* 390 F. 2d 476 (D.C.Cir. 1968), modified 404 F. 2d 1335; *Arnold v. United States,* 382 F. 2d 4 (9 Cir. 1967); *United States v. Gibson,* 392 F. 2d 373 (4th Cir. 1968); *United States v. Thomas,* 396 F. 2d 310 (2d Cir. 1968). Conversely, lengthy interrogation tends to indicate custody. *People v. Ryff,* 284 N.Y.S.2d 953 (N.Y.App. 1967); *State v. Skiffer,* 218 So. 2d 313 (La. 1969); *Commonwealth v. Banks,* 239 A. 2d 416 (Pa. 1968). The use of accusatory and leading questions tends to establish custody. *State v. Evans,* 439 S.W.2d 170 (Mo. 1969). Close and persistent questioning is indicative of custody. *United States v. Bekowies,* 432 F. 2d 8 (9th Cir. 1970). Confronting the suspect with evidence against him indicates custody. *People v. Arnold,* 426 P. 2d 515 (Cal. 1967); *Underwood v. State,* 465 S.W.2d 884 (Tenn. App. 1970); *United States v. Phelps,* 443 F. 2d 246 (5th Cir. 1971). Discounting a suspect's denials is also indicative of custody. *Commonwealth v. Sites,* 235 A. 2d 387 (Pa. 1967).

In the case at bar, the length of time during which the officers were in the presence of the appellant was no more than twenty minutes. The manner of the officers was friendly and non-accusatory. As soon as the officers learned the identity of the appellant's wife, she was asked back into the room and remained throughout the interview. The officers asked the appellant how he was feeling. He was informed that the young girl had died in the accident. A significant portion of the time was spent reading to the appellant his *Miranda* rights. The substantive interview itself was short to the point of being austere. The four questions asked the appellant were neutral in tone. The appellant was not confronted with evidence against him. He was not closely and persistently questioned. His denials were not discounted. The full text of the interview runs as follows:

"Q. Having been advised of your rights, do you now wish to make a statement?

A. I don't remember anything, I was unconscious and don't remember anything.

Q. Do you remember anything about yesterday 5-4-74?

A. I remember being with Mr. Martin and Mr. Hoyle showing them the truck. I do remember both Mr. Martin and Mr. Hoyle as driving the truck previously, but I don't remember who was driving at the time of the accident. I don't remember anything else.

Q. Did you have anything to drink previous to the accident?

A. I had a couple (2) bottles of beer earlier in the day, around noon.

Q. Is there anything else you can tell me?

A. No.

Note: After Mr. Cummings read and signed the statement he stated verbally 'I was only doing 40-45 M.P.H.' "

### G. Lack of Arrest After Interrogation

It is almost universally the law that where a suspect is not arrested and is allowed to remain free following the interview, the interrogation is deemed to have been non-custodial. *Evans v. United States,* 377 F.2d 535 (5th Cir. 1967); *Nobles v. United States,* 391 F. 2d 602 (5th Cir. 1968); *United States v. Manglona,* 414 F. 2d 642 (9th Cir. 1969); *United States v. Scully,* 415 F. 2d 680 (2nd Cir. 1969); *Virgin Islands v. Berne,* 412 F. 2d 1055 (3rd Cir. 1969); *United States v. Clark,* 294 F. Supp. 1108 (W.D.Pa. 1968); *Sharbor v. Gathright,* 295 F. Supp. 386 (W.D.Va. 1969); *United States v. Kubik,* 266 F. Supp. 501 (S.D. Iowa 1967); *United States v. Knight,* 261 F. Supp. 843 (E.D.Pa. 1966); *United States v. Littlepage,* 435 F. 2d 498 (5th Cir. 1970); *People v. Pantoja,* 184 N.W.2d 762 (Mich. App. 1970); *State v. Long,* 185 N.W.2d 472 (S.D. 1971); *State v. Hunt,* 447 P. 2d 896 (Ariz. App. 1968); *State v. Hall,* 468 P. 2d 598 (Ariz. App. 1970); *People v. Butterfield,* 65 Cal. Rptr. 765 (Cal. App. 1968);

*Commonwealth v. O'Toole,* 223 N.E.2d 87 (Mass. 1967) approved in *O'Toole v. Scafati,* 386 F. 2d 168 (1st Cir. 1967); *People v. Rogers,* 165 N.W.2d 337 (Mich. App. 1968); *State v. Seefeldt,* 242 A. 2d 322 (N.J. 1968); *People v. Williams,* 290 N.Y.S.2d 321 (Sup. Ct. 1968); *State v. Williams,* 168 S.E.2d 217 (N.C.App. 1969); *State v. Travis,* 441 P. 2d 597 (Ore. 1968); *Jones v. State,* 442 S.W.2d 698 (Tex.Cr.App. 1969); *State v. Lister,* 469 P. 2d 597 (Wash.App. 1970).

In the case at bar, the appellant was not arrested following the interview. He remained a free man.

### H. The Irrelevancy of "Investigative Focus"

The appellant makes much of the fact that Officer Hall, at the time of the hospital interview, had already talked to the two passengers who had been in the appellant's truck at the time of the collision and had learned that the appellant was the driver. The appellant argues that the investigation had therefore focused upon him.

The notion of "investigative focus" came from *Escobedo v. Illinois,* 378 U. S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964). Although many courts have been slow to shed this outworn linguistic baggage—a typical semantic inertia — the more advanced legal thought is the *Miranda's* notion of "custody" has totally superseded *Escobedo's* notion of "focus." The earlier case was a more primitive groping toward the idea that ultimately found expression in *Miranda.* The two notions are not compatible. *Escobedo's* "focus" looked to the state of mind of the interrogating policeman; *Miranda's* "custody" looks to the state of mind of a reasonable interrogated suspect.

In *Lowe v. United States,* 407 F. 2d 1391 (9th Cir. 1969), the United States Court of Appeals pointed out the shift in approach, at 1396-1397:

> "The Court's decision in *Miranda* clearly abandoned 'focus of investigation' as a test to determine when rights attach in confession cases. . . . The test now is whether or not the person 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.' . . .

In *Hoffa v. United States* . . . the Supreme Court held that whether or not the police have probable cause for arresting the suspect, has no relevance as to when the person's right to receive warnings attaches.

'Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.' . . .

In *Williams v. United States*, 381 F.2d 20, 22 (9 Cir. 1967), this Court stated, 'The fact that the officers had entertained an unexpressed intention to detain appellants had they compounded suspicion by refusing to answer and attempting to run does not amount to detention.' "

In *People v. Allen*, 281 N.Y.S.2d 602, 603 (N.Y.App. 1967), the unexpressed state of mind of the arresting officer was held to be totally irrelevant:

"The statement sought to be suppressed was made by defendant in his own home, in the presence of his wife and other persons, in answer to a question asked by the arresting police officer, prior to his arrest. Defendant had not been advised of his right to remain silent, of his right to counsel, or that any statement which he might make could be used against him. However, although the arresting officer testified that he went to defendant's home for the purpose of making an arrest, and would not have permitted defendant to leave the room before the interrogation was commenced, he had not so informed defendant; nor had he at that time taken him into custody or otherwise deprived him of his freedom of action."

And see *State v. Hall*, 468 P. 2d 598 (Ariz.App. 1970); *People v. Arnold*, 426 P. 2d 515 (Cal. 1967); *Allen v. United*

*States,* 390 F. 2d 476 (D.C.Cir. 1968); *Williams v. United States,* 381 F. 2d 20 (9th Cir. 1967); *United States v. Davis,* 259 F. Supp. 496 (D.Mass. 1966); *State v. Taylor,* 437 P. 2d 853 (Ore. 1968).

The academic commentators are in agreement. See Zagel, *op.cit.,* 6-12; Kamisar, *Criminal Law and the Constitution — Sources and Commentaries* (1968), "Custodial Interrogation within the Meaning of *Miranda,*" pp. 335, 338-51, 362; Graham, *What is Custodial Interrogation?,* 14 U.C.L.A.L.Rev. 59, 114-117 (1966).

It is clear that the question of "custody" in this case is to be viewed from the state of mind of the appellant (or, more precisely, the state of mind of a reasonable person in the appellant's circumstances) and not from the state of mind of Officer Hall. Under all of the circumstances and for all of the foregoing reasons, we conclude that there was no custody in this case. *Miranda* is, therefore, inapplicable.

### Was There Interrogation?

The only thing remotely incriminating produced by the four formal questions and answers was the appellant's admission to having had the proverbial "two beers." Of more significance was his parting comment after the formal interrogation had finished and as he was in the act of signing the statement. He added the gratuitous comment, "I was only doing 40-45 m.p.h." This was not incorporated into the written statement but was later noted on the body of the statement by Officer Hall, after Officer Hall had left the hospital room and adjourned to the hallway.

With respect to this final comment by the appellant, we think that *Miranda* is inapplicable for yet a second, distinct and independent reason — that it was not made in response to interrogation but was truly volunteered. *Miranda* itself held:

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their

admissibility is not affected by our holding today."
384 U. S. at 478.

Our own cases have consistently held that volunteered statements or "blurts," even when made in custodial surroundings, do not engage the machinery of *Miranda.* In *Carrington v. State,* 1 Md. App. 353, 230 A. 2d 112 (1967), an at-least-partially intoxicated occupant of a house wherein a homicide had just occurred greeted the first policeman upon the scene at the door and, in response to his question, "What happened?", poured out a full inculpatory tale. We held the statement to have been volunteered, placing it outside *Miranda's* protective orbit.

In *Carwell v. State,* 2 Md. App. 45, 50, 232 A. 2d 903 (1967), the damaging admission held to have been volunteered occurred just after the defendant was informed that he was under arrest. In *Campbell v. State,* 4 Md. App. 448, 243 A. 2d 642 (1968), the defendant was under arrest for armed robbery and was in the process of being given *Miranda* warnings when the following exchange took place:

> "How much time can I get for this?"
> "For what?"
> "For robbing the lady in the store."

We there said, at 4 Md. App. 449-450:

> "On the basis of the record before us, we need not determine whether appellant was given his constitutional warnings prior to the time he made the incriminating statement, or whether, if the warnings had been given, he waived his right to remain silent and to have counsel. We think it plain that while appellant was in custody when he made the statement in question, it was not made in response to an interrogation within the meaning of *Miranda.* It appears to us that the police officer merely responded to a question asked of him by the appellant, and that appellant's further statement made in response to the officer's question can in no

event be considered as resulting from an interrogation within the rationale and meaning of the *Miranda* decision."

In *Howell v. State,* 5 Md. App. 337, 247 A. 2d 291 (1968), the defendant was under custodial arrest for burglary. The defendant was given his *Miranda* warnings and stated that he did not wish to talk to the police. Approximately an hour and one-half later, the police confronted the defendant with the confession of a codefendant implicating both men. This knowledge was imparted in narrative form and no question was literally asked. The defendant then made several damaging admissions. In holding *Miranda* inapplicable, we said, at 5 Md. App. 338-339:

"While quite clearly appellant was in police custody when he made the incriminating admissions, we think it plain that his statements were not made in response to an 'interrogation' within the meaning of *Miranda.* On the record before us, we hold that there was no 'questioning initiated by law enforcement officers' within the ambit of the *Miranda* decision; rather, the officers respected appellant's right to remain silent following his arrest and it was not until almost two hours had elapsed that they advised him of what Eaton had told them. Appellant's response to such police information was not the product of an interrogation, either direct or subtle, but was more in the nature of volunteered information."

In *King v. State,* 5 Md. App. 652, 249 A. 2d 468 (1969), a prisoner in jail on other charges sought an interview, during the course of which he confessed to a series of crimes. Judge Orth there said, at 5 Md. App. 672-673:

"The Sergeant, out of an abundance of caution, followed the *Miranda* procedures, but we do not think it was necessary in the circumstances. Even though the appellant was 'in custody' by reason of his incarceration for an unrelated offense we do not believe that the challenged statement was obtained

under circumstances likely to affect substantially the appellant's will to resist and compelled him to speak where he would not otherwise have done so freely. See *People v. Rodney P.*, 233 N.E.2d 255, 286 N.Y.S.2d 225. The dangers *Miranda* intended to guard against were here not present. We do not think that the appellant was 'swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to * * * techniques of persuasion.' "

In *Bazzell v. State*, 6 Md. App. 194, 250 A. 2d 674 (1969), the defendant was arrested for burglary and spent the night in jail. First at midnight and again at 8 a.m., he declined to make a statement. At noon, a police sergeant took lunch with the defendant in his cell. Under the mistaken belief that what was said between the two of them could not be used in court, the defendant engaged in "general conversation" about the crime. In holding *Miranda* inapplicable, we said, at 6 Md. App. 199:

> "We think it is clear in the case at bar that the lower court was of the opinion, and we cannot disagree, that the statement given by the appellant to Sergeant Zombro was not elicited or induced as a result of interrogation by the Sergeant but was freely and voluntarily given by the appellant without any of the coercive factors which may normally be involved in a custodial interrogation. Here the appellant on two separate occasions declined to give a statement and no interrogation ensued. The trial judge, obviously, gave credence to Sergeant Zombro's version that the statement was given in the course of a 'general conversation' and that 'it was nothing along the lines of interrogation.' "

And see *Richardson v. State*, 6 Md. App. 448, 451-452, 251 A. 2d 924 (1969); *Blevins v. State*, 8 Md. App. 708, 710-711, 261 A. 2d 797 (1970) (statement made in a police car);

*Graybeal v. State,* 13 Md. App. 557, 561-562, 284 A. 2d 37 (1971) (volunteered admission in police barracks after earlier refusal to give statement).

Against the bench mark of these precedents, we have no difficulty in concluding that the parting comment made by the appellant in this case was not made in response to interrogation. The writing of the statement had been concluded. The place had already been arranged for the appellant's signature. The statement was presented to the appellant and he was in the act of signing it. No further questions were forthcoming. The non-incriminatory substance of the formal statement did not call for clarification or explanation. The admission in issue was not elicited by the police through custodial interrogation; the defendant chose to speak of his own free will. For yet this second reason, then, *Miranda* is not applicable.

### Harmless Error

Because the appellant's contention that the evidence was legally insufficient to permit the case to go to the jury requires us, in any event, to review thoroughly all of the evidence of guilt, it is not judicially uneconomical to consider the question of harmless error. Even had the admissions here in issue come into evidence erroneously and even had *Miranda* applied and not been complied with, it is our alternative holding that such error would have been harmless beyond a reasonable doubt.[5]

There were only two arguable admissions that bear on three arguable issues — the question of drinking, the question of speed and the question of who was driving the truck. We will look at the admissions in each of these

---

5. This is no passing dictum, but a considered and deliberate judgment by the Court, by way of alternative holding, after a thorough review of all of the evidence. We are persuaded beyond a reasonable doubt that the brief admissions here in issue did not contribute to the verdict. Our decision in the case would stand upon this holding alone. That a *Miranda* violation can be harmless error is not to be doubted. *Milton v. Wainwright,* 407 U. S. 371, 92 S. Ct. 2174, 33 L.Ed.2d 1 (1972); *Collins v. State,* 14 Md. App. 674, 288 A. 2d 221 (1972); *Sutton v. State,* 25 Md. App. 309, 321, 334 A. 2d 126 (1975).

regards vis-a-vis the other evidence bearing upon the same issues.

A. *"I Had a Couple (2) Bottles of Beer Earlier in the Day, Around Noon."*

This essentially exculpatory statement added nothing whatsoever (it may indeed have subtracted) to the evidence of the appellant's drinking. Clarence Martin testified that he met the appellant, on the day of the accident, at about noon. Mr. Martin testified that the threesome of himself, the appellant and Mr. Hoyle bought and consumed a six-pack of beer sometime during the afternoon. He also recalled that he and the appellant had had some alcoholic drink mixed with orange juice.

Larry Hoyle testified that he met the appellant, on the day of the accident, at between 4:30 and 5 p.m. He affirmed the testimony of Mr. Martin as to the purchase of a six-pack of beer in Dorsey. Mr. Hoyle also testified that before setting out in the truck, both he and the appellant had had "a few beers" at the appellant's house. On cross-examination, he upped the number of beers that he had had at the appellant's house to about "four or five."

The sworn testimony of the appellant himself on the subject of his drinking on the day of the accident makes the admission (if it be that) made in the hospital room pale into insignificance. The appellant testified that he started drinking at about noon with Mr. Martin. The two of them were drinking a combination called Tango — a mixture of orange juice and vodka — sometimes known as a screwdriver. Between them, they completely consumed a fifth of this Vodka-based beverage. Between them, they also consumed a six-pack of beer. They then went and picked up Mr. Hoyle. The second round of beer drinking took place at the appellant's house after they had returned there with Mr. Hoyle. The appellant testified that on this second occasion he had "maybe another couple of beers." The appellant testified that he had another beer during the time when the three men were driving around in the truck.

The conclusive evidence in this regard is that a blood

sample was taken of the appellant shortly after his arrival at the South Baltimore General Hospital at approximately 7:30 p.m. His blood alcohol content was 0.24. Even had the most shocking and unconstitutional of custodial interrogations produced the hospital admission in this regard (it did not), its impact, vis-a-vis the other evidence, was palpably harmless.[6]

### B. "I Was Only Doing ..."

The use of the pronoun "I" acknowledged the appellant's criminal agency as the driver of the truck. When the truck turned over, immediately after the collision, its three occupants came scrambling out of the cab and none of the other witnesses could state which one had been the driver. The truck, however, did belong to the appellant. Mr. Martin testified unequivocally that the appellant was the driver. Mr. Hoyle testified unequivocally that the appellant was the

---

**6.** It is sometimes argued that some error can never (or almost never) be harmless. There is in this argument a misperception of the function of harmless error. When we assay harmless error, we are neither condemning nor condoning the conduct which produced the error; we are simply weighing an item of proof and comparing the weight with that of other proof. At work is quantitative analysis, not moral judgment. The most innocent of error may be harmful in a borderline case; even unconscionable error may be harmless in an overpowering case. Yet the tendency to confuse "bad and good" with "great and small" goes relentlessly on. Scientific detachment is called for.

A hard example may illustrate the function. Eighty million persons, through the miracle of television, watched Jack Ruby shoot Lee Harvey Oswald in the stomach at point-blank range. Tens of millions more observed endless replays within the hour. Dozens of others were personally on hand as Ruby was apprehended with smoking gun in hand. Had Ruby later been turned upon the rack to wrench from his broken body a pitiable, "I did it," even that monstrous reversion to the tactics of a Torquemada would manifestly have been harmless in terms of its objective impact upon the verdict. When there are eighty million witnesses to an unambiguous event, even a tortured confession just does not make any difference.

At work must be not our sense of outrage at a cause, but cool, mathematical reckoning as to the relative impact of an effect. It is indisputably the effect that we are directed to measure, for we cannot reverse on the basis of a tortured confession not offered in evidence (or even offered but ruled inadmissible), no matter how intense our sense of offended fair play. Disapproval does not make the irrelevant relevant.

In measuring, the key word is relativity. A quantitatively big error may be proportionately small; a quantitatively small error may be proportionately large. There are no absolutes. We must measure not simply the error, but also the non-error, and then compare. The first measure is meaningless without the second.

driver. Their testimony in this regard was not shaken or eroded in any respect. Indeed, the appellant himself could not flatly contradict it. The hospital report, admitted into evidence, indicated that on the morning of May 5, the appellant had amnesia with respect to the accident and could remember nothing about it. The appellant's own testimony was that he was asleep and did not know who was driving.

In this regard, we note that the appellant and his wife, called on his behalf, did not testimonially contest the giving of the statement but directed the contest to the contents of the statement. They both claimed that the statement had been to the effect that "We could only have been doing 40-45 M.P.H." or "The truck could only have been doing 40-45 M.P.H." The issue at trial in this regard was, "What was said?" rather than "Why was it said?" The issue of whether the subject of the sentence was the pronoun "I," on the one hand, or the more general "We" or "The truck," on the other hand, is a pure credibility question, the resolution of which is the exclusive prerogative of the jury. Its impact in any event was, we feel, merely cumulative vis-a-vis the clear and unimpeached testimony of two eyewitnesses.

### C. "... Only Doing 40-45 M.P.H."

A speed of 40-45 miles per hour in a thirty mile per hour speed zone is evidence of some negligence, but hardly, standing alone, evidence of the gross criminal negligence required to prove manslaughter. Whether the subject of the statement in issue was "I" or "We" or "The truck," the characterization of the speed as "only doing 40-45 M.P.H." was as much self-serving as damaging — as much helpful as harmful. In any event, its impact vis-a-vis the other clear evidence of greater speed was de minimis.

Mrs. Davis, the driver of the Cadillac that was hit by the truck, testified that the truck "was in my lane and it was going fast." Mrs. Davis pulled all the way to her side of the road and stopped before the impact. Nevertheless the truck struck her car. William Meekins was driving southbound on Annapolis Road a short distance ahead of the Cadillac that was hit. He testified that he saw "the trailer-truck coming at

a high rate of speed." He said that it "was traveling fast." Moments thereafter, the collision occurred. Christopher Jones, a fourteen-year-old passenger in the Meekins' vehicle, testified that he saw "a truck speeding past." He turned and looked out the rear window of his automobile and testified that he saw the truck "hit the turn going the wrong side of the road and hit the car." Officer Hall observed on the scene not simply skid marks but "gouge marks." He testified that the gouge marks, as opposed to the skid marks, were produced when the truck hit the turn at too great a rate of speed so that centrifugal force, a function of that speed, forced it sideways toward the oncoming lane of traffic. The unexceptionable evidence of excessive speed was, in short, abundant and the very borderline admission in issue added nothing thereto.

## Legal Sufficiency of the Evidence

A thorough review of the evidence, much of it already discussed in considering the question of harmless error above, persuades us that the evidence was legally sufficient to permit the case to go to the jury. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731 (1968); *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331 (1970). There was evidence that the appellant was operating his trailer-truck at an excessive rate of speed while under the influence of alcohol. This is enough to establish the gross criminal negligence — the wanton or reckless disregard for human life — necessary to sustain a conviction for manslaughter by automobile. *Hughes v. State,* 198 Md. 424, 432, 84 A. 2d 419 (1951); *Duren v. State,* 203 Md. 584, 588, 102 A. 2d 277 (1954); *Thomas v. State,* 206 Md. 49, 51, 109 A. 2d 909 (1954); *Clay v. State,* 211 Md. 577, 584, 128 A. 2d 634 (1957); *Lilly v. State,* 212 Md. 436, 442, 129 A. 2d 839 (1957); *Johnson v. State,* 213 Md. 527, 531, 132 A. 2d 853 (1957); *A be v. State,* 230 Md. 439, 440, 187 A. 2d 467 (1963); *Wasileski v. State,* 241 Md. 323, 324, 216 A. 2d 551 (1966); *Montague v. State,* 3 Md. App. 66, 237 A. 2d 816 (1968).

*Judgments affirmed.*